ACUSHNET COMPANY, Amtel Incorporated, AVX Corporation, Berkshire Hathaway Inc., Bridgestone/Firestone Inc., Brittany Dyeing and Printing Corp., Chamberlain Manufacturing Corp., Commonwealth Electrical Company, Commonwealth Gas Company, Emhart Industries Inc., Goodyear Tire & Rubber Co., Paramount Communications Incorporated, Teledyne Rodney Metals a division of Teledyne Industries Incorporated, United Dominion Industries Inc., Plaintiffs,

v.

COATERS, INC., Cornell–Dubilier Electronics, Inc., Dartmouth Finishing Corp., Federal Pacific Electric Company, Fibre Leather Mfg. Co., Mohasco Corporation, Monogram Industries, Inc., d/b/a American Flexible Conduit, New England Telephone & Telegraph Company, Nortek Inc., Ottaway Newspapers, Inc., Revere Copper and Brass Inc., Revere Copper Products, Inc., The City of New Bedford, and Savit Corp., Defendants.

Civil Action No. 93–11219–REK.

United States District Court,
D. Massachusetts.

July 30, 1997.

44

Stephen J. Brake, Nutter, McClennen & Fish, Boston, MA, David M. Jones, Roger C. Zehntner, George H. Wilcox, Wendy del Real, Kirkpatrick & Lockhart, Boston, MA, William L. Lahey, Palmer & Dodge, Boston, MA, for Acushnet Co.

Stephen J. Brake, Nutter, McClennen & Fish, Boston, MA, David M. Jones, Roger C. Zehntner, George H. Wilcox, Kirkpatrick & Lockhart, Boston, MA, for Amtel Inc., Berkshire Hathaway, Inc., Bridgestone/Firestone, Inc., Chamberlain Mfg. Corp., Com. Elec. Co., Com. Gas Co., Emhart Ind., Inc., Goodyear Tire & Rubber Co., Paramount Communications Inc., Teledyne Rodney Metals, United Dominion Industries, Inc.

Stephen J. Brake, Mary K. Ryan, Nutter, McClennen & Fish, Boston, MA, David M. Jones, Irene C. Freidel, Roger C. Zehntner, George H. Wilcox, Kirkpatrick & Lockhart, Boston, MA, for AVX Corp.

M. Frederick Pritzker, Wayne F. Dennison, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Brittany Dyeing and Printing Corp.

William J. Cheeseman, George N. Lester, Foley, Hoag & Eliot, Boston, MA, Robert A. Murphy, Andrew M. Higgins, Casner & Edwards, Boston, MA, for Cornell–Dubilier Electronics.

Alexander T. Bok, Boston, MA, Edward T. Dangel, III, Dangel, Donlan and Fine, Boston, MA, for Dartmouth Finishing Corp.

Seth D. Jaffe, Anne D. Berlin, Jeffrey L. Roelofs, Foley, Hoag & Eliot, Boston, MA, for New England Tel. & Tel. Co.

James A.G. Hamilton, Lawrence G. Green, Perkins, Smith & Cohen, Boston, MA, for Revere Copper and Brass Inc., Revere Copper Products Inc.

Arthur J. Caron, Jr., City Solicitor, New Bedford, MA, for City of New Bedford.

## Opinion

KEETON, District Judge.

## I. INTRODUCTION

### A. Questions About the Terms of Final Judgment

The questions now to be decided concern what final judgment is to be entered, after extended pretrial and trial proceedings (both jury and non-jury), on claims of "settling parties" against non-settling parties for contribution of shares of remediation costs, past and future, of the "Sullivan's Ledge Site" in New Bedford, Massachusetts.

For the reasons explained in this opinion, the court (i) orders dismissal of claims of plaintiffs against several defendants (together with dismissal of counterclaims, cross-claims, and third party claims), in accordance with stipulations, settlements, consent decrees, and orders made as proceedings developed in this case, (ii) orders judgment against plaintiffs for all other defendants except Cornell–Dubilier Electronics, Inc. ("CDE"), (iii) orders judgment for plaintiffs against CDE for a share of responsibility for reimbursement of costs already paid by plaintiffs for remediation, at each of the sites designated as OU No. 1 and OU No. 2, to the date of the verdict on site OU No. 1, December 20, 1996, and through February 26, 1997 on site OU No. 2, and (iv) orders judgment

declaring provisionally the rights and liabilities among plaintiffs and CDE for remediation costs incurred after those dates.

## B. Summary of Background Facts and Court Proceedings

Previously published opinions in this case state background facts and explain pre-trial proceedings, the court's rulings on dispositive motions during trial, and rulings reserving identified issues for determination either by the jury (impaneled in the case for one phase of trial) or by the court in non-jury phases of trial. *See Acushnet Co. v. Coaters, Inc.*, 948 F.Supp. 128 (D.Mass.1996); *Acushnet Co. v. Coaters, Inc.*, 937 F.Supp. 988 (D.Mass.1996).

On June 13, 1995, this court approved a settlement and consent decree resolving all claims and counterclaims between plaintiffs and the City of New Bedford.

On February 12, 1996, upon joint motion of the parties who are plaintiffs in this action and Savit Corp., the court dismissed the plaintiffs' claims against Savit Corp. with prejudice and without costs.

On July 24, 1996, this court granted summary judgment in favor of defendant New England Telephone and Telegraph Company (NETT) against all plaintiffs, and accepted NETT's waiver of all its counterclaims and crossclaims, subject to right of withdrawal of the waiver should the judgment in its favor against all plaintiffs be vacated or modified by later order of this or a higher court.

On November 7, 1996, this court granted judgment as a matter of law, after plaintiffs had been fully heard during trial before a jury, in favor of defendant Federal Pacific Electric Company (FPE), against all plaintiffs.

On December 2, 1996, this court approved a settlement and consent decree among the Environmental Protection Agency, the parties who are plaintiffs in this case, Coaters, Inc., defendant in this case, Fibre Leather Mfg. Co., defendant in this case, and others. Under the terms of this settlement and consent decree, all claims (including counterclaims and crossclaims) among Coaters, Inc., Fibre Leather Mfg. Co., and all plaintiffs in this case were resolved and ordered dismissed with prejudice and without costs.

On December 2, 1996, on conclusions and for reasons stated and explained orally of record at that time and supplemented in the opinion of December 17, 1996 (Docket No. 576), this court granted judgment as a matter of law, after plaintiffs had been fully heard during trial before a jury, in favor of defendants Mohasco Corporation, Monogram Industries, Inc., d/b/a American Flexible Conduit, Ottaway Newspapers, Inc., and Nortek, Inc.

On December 20, 1996, the court received the following jury verdict in response to interrogatories:

## Verdict

### I. Findings as to Costs
### Plaintiffs Have Already Incurred

1. What amount do you find by a preponderance of the evidence to be reasonable costs actually paid out by plaintiffs on or before the date of your verdict for each of the following kinds of remediation costs? Answer in DOLLARS or by a checkmark beside NONE for each of items a–k.

| | | | |
|---|---|---|---|
| a. | Payments to Baker Environmental | $ 915,314.99 | NONE ____ |
| b. | Payments to O'Brien & Gere for Implementation of Pre–Design Work Plan | $3,503,007.10 | NONE ____ |
| c. | Payments to O'Brien & Gere for Remedial Design Work | $1,284,621.15 | NONE ____ |
| d. | Payments to O'Brien & Gere for Interim Project Coordinator Work | $ 337,223.29 | NONE ____ |
| e. | Payments to Palmer & Dodge | $ 603,937.00 | NONE ____ |

f. Payments for Project Management Committee Work $ 294,076.58 NONE ____

g. Reimbursement of Past Costs to EPA and DEP $ 644,983.30 NONE ____

h. Payments to EPA and DEP for Oversight Costs $ 569,850.48 NONE ____

i. Payments to Burke and Smith for Access to Golf Course $ 4,107.50 NONE ____

j. Payments to New Bedford Realty for Rental of Cinema Parking Lot $ 13,500.00 NONE ____

k. Payments to Pettiti & Gamache, Hodgson & Petti-ti, and J.G. Hodgson for Audit and Tax Work $ 30,127.36 NONE ____

## II. Findings as to Hazardous Substances

1. **PCBs**

Do you find by a preponderance of the evidence that Cornell–Dubilier Electronics (CDE) arranged for the disposal of polychlorinated biphenyls (PCBs) within the OU No. 1 area of the Sullivan's Ledge site?

__X_ YES ____NO

2. **TCE**

Do you find by a preponderance of the evidence that Cornell–Dubilier Electronics (CDE) arranged for the disposal of trichlorethylene (TCE) within the OU No. 1 area of the Sullivan's Ledge site?

__X_ YES ____NO

**If you answer NO to both of Questions 1 and 2, answer no other questions. Otherwise, go to Question 3 below.**

3.a. Did the quantity, toxicity, or durability (or a combination of quantity, toxicity, and durability)

of the total PCBs and TCE, contributed by CDE and others who contributed no more than did CDE to disposal of PCBs and TCE within the OU No. 1 area,

add enough to contamination from sources other than these to make a reasonably determinable difference in the amount of reasonably necessary response costs incurred by plaintiffs? Answer by placing a checkmark in only one of the three blanks.

__X__ We unanimously find YES by a preponderance
 of the evidence
_____We unanimously find NO by a preponderance
 of the evidence
_____We unanimously find no preponderance
 of the evidence for an answer of YES or NO

3.b. Was the quantity, toxicity, or durability (or a combination of quantity, toxicity, and durability)

of the PCBs and TCE disposed of by CDE within the OU No. 1 area

enough to weigh as one of the "equitable factors" in your determination of fair and equitable allocation of shares of responsibility

for reasonably necessary remediation costs already paid and to be incurred in the future by plaintiffs under their agreement and consent decree with EPA? Answer by placing a checkmark in only one of the three blanks.

 _X_ We unanimously find YES by a preponderance
 of the evidence
 ____We unanimously find NO by a preponderance
 of the evidence
 ____We unanimously find no preponderance
 of the evidence for an answer of YES or NO

**Skip Part III if you have answered NO to all of the questions you answered in Part II.**

### III. Findings as to Allocation of Shares

The percentages of responsibility you find in answering this question must add up to 100%. Under the evidence in this case, you may find that one of the equitable shares of responsibility is less than 1%. The mathematical expression of a share less than one percent may become difficult to write, read, and compare with other shares. For this reason, you are directed to express your findings in whole numbers of shares, using either the number 1 or the number 10 for the smallest share and appropriately larger numbers for all other shares.

After weighing each of the equitable factors as to which you find that evidence before you gives you a basis for assigning some weight one way or the other, and taking into account your answers to questions in Part II as to any hazardous substances at Sullivan's Ledge traceable to CDE, in order to have equitable sharing of <u>reasonably necessary remediation costs plaintiffs have already paid and will incur in the future,</u> what number of shares do you find to be appropriate for CDE, for plaintiffs (as a group), and for others?

### 1. Remediation Costs Plaintiffs Have Already Paid

Answer by placing a checkmark beside only one of a, b, and c. Then complete other blanks that go with whichever of a, b, or c you have checked.

____ a. We unanimously find by a preponderance of the evidence the following shares:

 _____ shares for CDE
 _____ shares in total for plaintiffs as a group
 _____ shares for Coaters
 _____ shares for Fibre Leather

 _____ TOTAL SHARES

_X_ b. We unanimously find no preponderance of the evidence; our best estimate is that the shares should be as follows:

 _____7_____ shares for CDE
 _____83_____ shares in total for plaintiffs as a group
 _____5_____ shares for Coaters
 _____5_____ shares for Fibre Leather

 _____100_____ TOTAL SHARES

____ c. We unanimously find the evidence insufficient to make any estimate that

is reasoned from evidence

## 2. Remediation Costs Plaintiffs Will Incur in the Future

Answer by placing a checkmark beside only one of a, b, and c. Then complete other blanks that go with whichever of a, b, or c you have checked.

_____ a. We unanimously find by a preponderance of the evidence the following shares:

_____ shares for CDE
_____ shares in total for plaintiffs as a group

_____ shares for Coaters
_____ shares for Fibre Leather

_____ TOTAL SHARES

_X_ b. We unanimously find no preponderance of the evidence; our best estimate is that the shares should be as follows:

_____7_____ shares for CDE
_____83_____ shares in total for plaintiffs as a group
_____5_____ shares for Coaters
_____5_____ shares for Fibre Leather

_____100_____ TOTAL SHARES

_____ c. We unanimously find the evidence insufficient to make any estimate that is reasoned from evidence

_____12/20/96_____ /s/ Barbara E. Rattigan
Date Foreperson

Post-verdict phases of trial, together with hearings on post-verdict motions, commenced on January 2, 1997. The total in-court time for these hearings was no more than about 40 hours, but the parties requested and were allowed substantial intervening periods of time, partly for negotiations that resolved some of the remaining disputes, partly for preparation of documents reporting and implementing agreements that were reached on some matters, and partly for preparing and filing submissions in support of their respective positions on all remaining disputes. All proceedings were completed with an oral hearing regarding the precise terms of the Final Judgment, on July 23, 1997.

On March 20, 1997, upon joint motion of the plaintiffs in this action and Dartmouth Finishing Corp., this court dismissed the plaintiffs' claims against Dartmouth Finishing Corp. with prejudice and without costs.

On July 23, 1997, the court denied plaintiffs' motion for a partial separate final judgment with respect to claims against Revere Copper & Brass, Inc. and Revere Copper Products, Inc. (together called "Revere"), and allowed plaintiffs' alternative motion for dismissal without prejudice of their claims against Revere, subject to an application for leave to seek reinstatement of such claims should a higher court reverse, vacate, or otherwise set aside the final judgment dismissing plaintiffs' claims against one or more of the other defendants.

On July 14–18 and 21–23, 1997, on findings and conclusions and for reasons stated orally of record at hearings commencing on January 2, 1997 and concluding on July 23, 1997, and supplemented in the opinion of July ___,

1997, this court made additional rulings and orders resolving other issues material to final judgment.

This opinion summarizes and explains post-verdict rulings, reasons for them, and reasons for the unusual terms of the final judgment. These unusual terms respond to distinctive legal and factual issues of extraordinary complexity that have arisen in this case. Included are questions of law that must be decided to determine the outcome in this case and have not previously been decided in opinions of higher courts that are binding in this circuit.

## II. COURT RULINGS (REFLECTED IN THE VERDICT FORM AND CHARGE TO THE JURY) AND JURY FINDINGS

### A. Factual Findings as to Costs Already Incurred

In pre- and post-verdict hearings, the court denied motions of plaintiffs and CDE asking that the court (not the jury) decide all issues regarding claims for reimbursement of costs already paid.

The court also overruled the objections of plaintiffs and CDE to the court's submitting questions 1(a)–(k) to the jury. These questions concern claims for reimbursement of remediation costs incurred by plaintiffs before the date of the verdict.

*Each* party contended also, both before and after verdict, that the court should have decided these questions as matters of law are decided.

Plaintiffs claimed that they were entitled to full reimbursement as a matter of law. The court ruled that these claims could not be decided as a matter of law, for reasons explained in the second of the previously published opinions. 948 F.Supp. at 132–42.

Once the court had ruled that a settling party may claim reimbursement of a share of remediation costs against a non-settling party upon satisfaction of a threshold-of-significance standard—*see id.* at 133–36, 140–42—CDE's remaining objections to the court's submitting to the jury questions regarding remediation costs already incurred were of

the following types: (a) CDE's contention that, both as to causation and as to any reasonable basis for allocation of shares, the evidence proffered by plaintiffs in this case was speculative and insufficient to support a finding, reasoned from evidence, for plaintiffs; (b) CDE's contention that plaintiffs' claims were either premature or precluded under the terms of an agreement between plaintiffs and the Environmental Protection Agency ("EPA"); (c) CDE's challenges to the sufficiency of the evidence to support the amounts claimed for specific items of costs. Most of the issues were resolved by agreement during post-verdict negotiations. The objections that remained in dispute were resolved by a stipulation filed on July 22, 1997.

As to costs of remediation at the OU No. 1 site incurred and paid by plaintiffs before verdict, the court will order judgment for plaintiffs based on jury findings as modified by the stipulation of July 22, 1997. The percentage share of these costs that plaintiffs are to recover from CDE is 7.0 percent of the amount agreed upon in the stipulation of July 22, 1997.

### B. Findings as to Hazardous Substances

Both in fashioning the verdict form and in ruling on objections to it and to the charge, the court rejected plaintiffs' contention that plaintiffs were entitled to judgment as a matter of law for total reimbursement, and in the alternative for a share determined by the court and not by a jury. Some of the background for these rulings was explained in the second published opinion. *See id.* at 134–36, 140–42.

As explained orally on the record during trial before the jury (partly in their presence and more fully out of their presence), the court concluded that disputable fact issues were presented by the evidence as to whether CDE arranged for the disposal of PCBs and TCE within the OU No. 1 area. These questions were submitted to the jury in Part II of the verdict form, questions 1 and 2.

Under instructions on the verdict form, an affirmative answer to either of these questions led to more questions of disputable fact, submitted in Part II of the verdict form as questions 3.a and 3.b:

a. whether the quantity, toxicity, or durability (or a combination of quantity, toxicity, and durability) of the total of PCBs and TCE,

> contributed by CDE and others who contributed no more than did CDE to disposal of PCBs and TCE within the OU No. 1 area,

added enough to contamination from sources other than these to make a reasonably determinable difference in the amount of reasonably necessary response costs incurred by plaintiffs; and

b. whether the quantity, toxicity, and durability (or a combination of quantity, toxicity, and durability)

> was enough to weigh as one of the "equitable factors" in a determination of fair and equitable allocation of shares of responsibility.

A potentially significant dispute of law was presented by the contrasting contentions of the parties concerning the burden of proof on the factual questions designated as 3.a and 3.b. Because the law is unsettled on this matter, the court required the jury to choose one of three possible answers as shown in the verdict form. The jury's answer unanimously finding YES by a preponderance of the evidence has mooted this disputed legal issue regarding burden of proof.

This opinion says no more about this burden-of-proof issue, except for calling attention (in Parts II.D and III through V) to developments in the law that bear upon how this and other unsettled questions of law are to be decided when they are essential to determining the outcome of a case.

## C. Cause–in–Fact Among Multiple Contributors of Hazardous Waste

The clashing primary contentions of plaintiffs and CDE were that attorneys on each side said the court should decide causation issues in their favor as a matter of law. Except for maintaining these respective positions in their objections to the verdict form and charge, neither the plaintiffs nor CDE objected to the framing of question 3.a and to the court's explanation to the jury of cause-in-fact and the meaning of "substantial fac-

tor" as used in a context of hundreds of alleged contributors of varying quantities, toxicity, and durability of hazardous waste. The cause-in-fact issue in this case is another of the matters as to which no guiding precedent on point can be found, and the requests for instruction and drafting suggestions of counsel for plaintiffs and CDE substantially aided the court in fashioning a suitable instruction on this issue. The formulation developed, in this consultation, for use in this trial is similar to the alternative recommended in W. Page Keeton, et al., *Prosser & Keeton on Torts* (5th ed.1984), for

> cases in which each of the defendants bears a like relationship to the event [for which legal responsibility is to be assigned or allocated]. Each seeks to escape liability for a reason that, if recognized, would likewise protect each other defendant in the group, thus leaving the plaintiff without a remedy in the face of the fact that had none of them acted improperly the plaintiff would not have suffered the harm. Candid recognition of this fact as a reason for holding that the conduct of each of such similarly situated defendants is a cause in fact of the event seems preferable to the substantial-factor rule.

*Id.* at 268–69 (footnote omitted).

The alternative formulation recommended in Prosser & Keeton is as follows:

> When the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event.

*Id.* at 268. The appended footnote states:

> Although no judicial opinion has approved this formulation, results reached in reported cases are almost uniformly consistent with it.

*Id.* at n. 40.

The parties to this case preferred that the relevant portion of the charge to the jury accept the terminology of "substantial factor" and then define "substantial factor," in the context of hundreds or more contributors of hazardous substances to a site, in a way

closely analogous to the alternative formulation cited above. The court adopted this suggestion. The explanation of this aspect of question 3.a, in the court's charge, was as follows:

Question II.3.a requires you to consider whether the disposal of identified substances at Sullivan's Ledge made "a reasonably determinable difference" in the amount of costs paid and incurred by the plaintiffs. In determining whether the disposal of the identified substances at the site made a difference, you must consider whether that disposal was a substantial factor in bringing about some or all of the costs to remediate the site.

In determining whether disposal by CDE was a substantial factor in causing plaintiffs to incur response costs, you may consider among other factors you find to be relevant,

(a) the type, quantity, toxicity, and durability of hazardous substances that are being cleaned up;

(b) criteria applicable to the determination that investigation and cleanup was necessary for soil, sediments, or groundwater at the Sullivan's Ledge site;

(c) criteria applicable to the performance of response actions at the site, including without limitation, determination of the time of completion of the cleanup of soil, sediments, or groundwater;

(d) the type, quantity, toxicity, and durability of hazardous substances disposed of at the Sullivan's Ledge site by a defendant.

A person's conduct may be a substantial factor in causing a harmful result even though other causes have contributed to the result, since such causes, innumerable, are always present. If you find that the conduct of two or more actors is so related to an event that their *combined* conduct, viewed as a whole, is a but-for cause of the harmful result, and application of the but-for rule to them individually would relieve all of them of responsibility, then you may find that the conduct of *each* actor is a substantial factor in causing the harm. In a moment I will use an example, not drawn from the evidence in this case but instead a hypothetical example, to help you understand the meaning of substantial factor.

This example will also include further explanation that will help you understand questions II.3.a, II.3.b, and III. It is a hypothetical *not* based on evidence in this case, just as an example. Assume a case in which there is evidence that 100 entities contributed hazardous substances to a site, and no evidence about any other contributors. Assume that we have enough evidence to fix the comparative contributions of hazardous substances in sequence from No. 1, the heaviest contributor, down to No. 100, the least contributor.

Would the remediation costs have been just the same—no less and no more—if the hazardous substances from the smallest contributor (whom we designated No. 100) never got to the site? If so, the answer to a question like question II.3.a about contributor No. 100 would be NO.

Would the remediation costs have been just the same—no less and no more—if all of the hazardous substances from the smallest five contributors (whom we have designated Nos. 100, 99, 98, 97, and 96) never got to the site? If so, the answer to a question like II.3.a about each of Nos. 100, 99, 98, 97, and 96 would be NO.

If, however, a finder of fact found that remediation costs would have been less if No. 95's contribution as well as those of 96–100 had never reached the site, then the answer to a question like II.3.a about contributor No. 95 would be YES. That is, the contributors of Nos. 95–100, together, did make a difference. Also, the answer for Nos. 1–94, each of whom contributed more than No. 95, would be YES.

As stated orally on the record during post-verdict proceedings, the court ruled that the evidence was sufficient to support the jury finding, for the plaintiffs and against CDE, on this causation issue. This finding is accepted by the court as part of the basis for the judgment to be entered.

## D. Findings as to Allocation of Shares

Because of unsettled law with respect to placement of burdens (on what party) and

standards of decision (by a preponderance of the evidence or by a standard demanding more—such as clear and convincing—or by a standard demanding less—such as sufficient to make a reasoned estimate), Part III of the verdict form used a tri-partite submission.

Had the jury made a finding by a preponderance of the evidence, for one side or the other, these unsettled questions of law might have become moot in this case. The jury did not do so. Instead they answered:

**1. Remediation Costs Plaintiffs Have Already Paid**

_X_ b. We unanimously find no preponderance of the evidence; our bestestimate is that the shares should be as follows:

 7 shares for CDE
 83 shares in total for plaintiffs as a group
 5 shares for Coaters
 5 shares for Fibre Leather

 100 TOTAL SHARES

**1. Remediation Costs Plaintiffs Will Incur in the Future**

_____ b. We unanimously find no preponderance of the evidence; our bestestimate is that the shares should be as follows:

 7 shares for CDE
 83 shares in total for plaintiffs as a group
 5 shares for Coaters
 5 shares for Fibre Leather

 100 TOTAL SHARES

In post-verdict proceedings I have denied motions of all parties to set aside or disregard these findings and have overruled objections to them. Also, I have denied other motions that were premised on the motions to disregard and the objections. I conclude that the findings of the jury in Part III of the verdict are well supported by evidence.

█ Also, to avoid any risk of leaving a matter unresolved that might lead to a necessity for remand rather than instructions as to what modified judgment to enter should a higher court reject one or more of my rulings bearing upon the judgment to be entered in this case, I now explicitly proceed to address this set of questions as a finder of fact.

As did the jury, I find no preponderance of the evidence either way on these questions. This case and most cases one may reasonably expect to arise, under the law of hazardous waste disposal as it now stands, are paradigm illustrations of rules and rulings of law establishing tests for legal accountability that require consideration of more than a single matter. That is, a test for legal accountability in a context such as this is either a multi-step test requiring consideration of two or more "elements," each of which must be satisfied separately, or it is a test requiring a one-step evaluative decision, based upon consideration of two or more (often many) "factors." In the context of hazardous waste remediation, rarely if ever can most of the "elements" or "factors" be proved with a degree of probability even approaching the more-probable-than-not (preponderance-of-the-evidence) standard.

Important distinctions exist between "elements" tests and "factors" tests. *See, e.g., Harris v. Forklift Sys.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (psychological

harm, like any other relevant "factor," may be taken into account in determining whether an employment environment is "hostile" or "abusive," but no single "factor" is alone decisive); *Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 944–48 (1st Cir.1995) (holding, in light of *Harris,* that it was enough to charge the jury that unreasonable interference with Scarfo's work performance was an absolute requirement for showing hostile or abusive work environment); *United States v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968, 983 (2d Cir.1984) (various components of Fed.R.Civ.P. 24(a) directive regarding intervention are not bright lines but ranges; components must "be read not discretely but together"). *See also Ciba–Geigy Corp. v. Liberty Mut. Ins. Co.,* 149 N.J. 278, 299–300, 693 A.2d 844, 854 (N.J.1997) (disputes between an insured and an insurer concerning future coverage for environmental remediation costs did not exist historically as part of a jury trial and remediation is a form of equitable relief that can require continuing supervision; damages are not calculable and determinations of declaratory and equitable relief depend on many considerations). Regardless, however, of whether higher courts adopt an "elements" test for this context of hazardous waste remediation, or instead a "factors" test, or some combination, the point will remain that proving an element or factor by a preponderance of the evidence will be so difficult, if not impossible, that the placement on a party of a burden of proof by a preponderance of the evidence will ordinarily assure decision of the case against that party.

Interests in clarity and candor about grounds for judicial decisions of cases before the courts make a compelling case for acknowledging this reality of a dearth of accessible evidence and fashioning legal tests that take it into account. More reasons for this position are explained in Part III, below.

My finding of fact is that even the issues about shares of accountability for costs already incurred cannot be answered by a preponderance of the evidence in this case. For added practical reasons, predictions about future costs and equitable shares are necessarily even more difficult to make with a degree of confidence that can be characterized accurately as predictions that it is more probable than not that the shares assigned will turn out to be equitable when future events unfold.

## III. A PRELIMINARY EXAMINATION OF GROUNDS FOR FUTURE REMEDIATION COSTS AND EQUITABLE SHARES

### A. The Court's Obligation to Decide Regardless of Complexity

The constitutional structure allocating authority and responsibility among the Branches of state and national governments in the United States places responsibility on courts to decide cases filed before them that present issues of law and fact within the scope of their jurisdiction. A court is not permitted the luxury of declining to decide because the material issues are so complex that any decision will be extraordinarily difficult and inevitably controversial. For controversies within the scope of their jurisdiction, courts are the place of last resort for persons or entities who have claims or defenses that no other governmental institution can be moved to resolve by taking decisive action within the scope of its constitutional authority.

Increasingly, as economic, social, and personal relationships become more complex, clashes of interest produce controversies far more complex than paradigm tort, contract, and property controversies that constituted the regular fare of court dockets historically and well into the 20th century. A perceptive scholar, commenting recently on responses of various institutions and professionals to the reality of extreme complexity in a significant percentage of current controversies, remarked:

Restricting one's attention to particular aspects of reality reduces complexity, making it possible to solve problems that otherwise would boggle the mind. The disadvantage in restricting one's attention, however, is that it often screens out important aspects and leads the analyst to the wrong conclusion.

Lynn M. LoPucki, *The Systems Approach to Law,* 82 Cornell L. Rev. 479, 480 (1997).

Other decisionmakers, as well as commentators, may choose the course of adopting hypothetically simplifying assumptions as they discuss and write about present and future remediation of past hazardous waste disposal. To decide the cases that are before them, and are within the scope of their jurisdiction, courts are not permitted this choice. To decide cases, they must address the realities regardless of complexity, and declare outcomes despite conflicting positions, for each of which reasonable arguments can be advanced by professionals responsibly representing their clients.

## B. The Statutory Provisions at Issue

### Excerpts from CERCLA and SARA as Amended and Codified in 42 U.S.C. Chapter 103

#### § 9601(20)

(A) The term "owner or operator" means (i) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel, (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility, and (iii) in the case of any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency abandonment, or similar means to a unit of State or local government, any person who owned, operated, or otherwise controlled activities at such facility immediately beforehand. Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility.

. . . . .

(D) The term "owner or operator" does not include a unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign. The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

. . . . .

### § 9606. Abatement actions

#### (a) Maintenance, jurisdiction, etc.

In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and *the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also,* after notice to the affected State, *take other action under this section including,* but not limited to, *issuing such orders as may be necessary to protect public health and welfare and the environment.*

(Emphasis added.)

### § 9607. Liability

#### (a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for

disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, *from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—*

(A) *all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;*

(B) *any other necessary costs of response incurred by any other person consistent with the national contingency plan;*

(C) *damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release;* and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title. *The amounts recoverable in an action under this section shall include interest* on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26. For purposes of applying such amendments to interest under this subsection, the term "compa-rable maturity" shall be determined with reference to the date on which interest accruing under this subsection commences.

(Emphasis added.)

### § 9613(f) Contribution

#### (1) Contribution

*Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims* shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and *shall be governed by Federal law.* In resolving contribution claims, *the court may allocate response costs* among liable parties using such *equitable factors* as the court determines are appropriate. Nothing in this subsection shall diminish *the right of any person to bring an action for contribution* in the absence of a civil action under section 9606 of this title or section 9607 of this title.

(Emphasis added.)

#### (2) Settlement

*A person who has resolved its liability to the United States or a State* in an administrative or judicially approved settlement *shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement* does not discharge any of the other potentially liable persons unless its terms so provide, but it *reduces the potential liability of the others by the amount of the settlement.*

#### (3) Persons not party to settlement

(A) If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the *United States or the State may bring an action against any person who has not so resolved its liability.*

(B) *A person who has resolved its liability to the United States or a* State for some or all of a response action or for

some or all of the costs of such action in an administrative or judicially approved settlement *may seek contribution from any person who is not party to a settlement referred to in paragraph (2).*

(C) *In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.*

(Emphasis added.)

* * * * *

## § 9613(h) Timing of review

No Federal court shall have jurisdiction under Federal law other than under section 1332 of title 28 of the United States Code (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 (relating to cleanup standards) to review any challenges to removal [of contaminated soils, for example] or remedial action selected under section 9604, or to review any order issued under section 9606(a), in any action except [those specified in subparagraphs designated (1)–(5)].

42 U.S.C. § 9613(h).

* * * * *

## § 9613(i) Intervention

In any action commenced under this chapter or under the Solid Waste Disposal act [42 U.S.C.A. § 6901 et seq.] in a court of the United States, any person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented by existing parties.

42 U.S.C. § 9613(i).

## § 9613(j) Judicial review

### (1) Limitation

In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.

### (2) Standard

In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.

### (3) Remedy

If the court finds that the selection of the response action was arbitrary and capricious or otherwise not in accordance with law, the court shall award (A) only the response costs or damages that are not inconsistent with the national contingency plan, and (B) such other relief as is consistent with the National Contingency Plan.

### (4) Procedural errors

In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not be made.

42 U.S.C. § 9613(j).

## § 9622(f)(6)(A)

### (6) Additional condition for future liability

(A) Except for the portion of the remedial action which is subject to a covenant not to sue under paragraph (2) or under subsection (g) of this section (relating to de minimis settlements), a covenant not to sue a person concerning future liability to the United States shall include an exception to the covenant that allows the President to sue such person concerning future liability resulting from the release or threatened release that is the subject of the covenant where such liability arises out of conditions

which are unknown at the time the President certifies under paragraph (3) that remedial action has been completed at the facility concerned.

42 U.S.C. § 9622(f)(6)(A).

## C. A Recent Instance of Supreme Court Interpretation of Statutory Provisions About Future Loss

The issue of statutory interpretation presented by this case is different in both context and detail from the issue that divided the Supreme Court of the United States 6–3 in *Metropolitan Stevedore Company v. Rambo,* —— U.S. ——, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997), but from a more generalized perspective the two issues are alike. The issue in *Metropolitan Stevedore* concerned what kind of judgment should be made, under applicable provisions of the Longshore and Harbor Workers' Compensation Act, on the claim for long-term future benefits for a worker (Rambo), stipulated to have

> suffered 22 1/2 % permanent partial disability as a result of his injury, whereby Rambo established that the injury impaired his ability to undertake at least some types of previously available gainful labor and thus prevented him from earning as much as he had before his accident.

*Id.,* at ——, 117 S.Ct. at 1964.

Because of intervening training for higher-paying work and intervening market developments opening up demands for workers qualified for the higher-paying jobs, the ALJ found that "Rambo is now able to earn market wages as a crane operator significantly greater than his pre-injury earnings." *Id.* No reliable prediction could be made, however, about whether these favorable market conditions would prevail throughout Rambo's work life expectancy.

Justice Souter, delivering the opinion of the Court in *Metropolitan Stevedore,* observed that because an injured worker who in these circumstances

> has a basis to anticipate wage loss in the future resulting from a combination of his injury and job-market opportunities must nonetheless claim promptly [under a one-year statutory limitation], it is likely that

Congress intended "disability" to include the injury-related potential for future wage-loss.

*Id.,* at ——, 117 S.Ct. at 1959. Supporting reasons for this interpretation of the Act are stated in a footnote. They explain a concept of "awarding nominal compensation," a concept of "permitting protective filings," and a relationship between these two concepts.

> A different conclusion might, perhaps, be drawn from our observation 46 years ago in *Pillsbury,* 342 U.S. at 198–199 [72 S.Ct. at 224–225], that the agency allowed claims to be filed within one-year of injury but before recovery for present disability could be had. If that practice were assumed to be authorized by the Act, an injured worker who anticipated future loss of earning capacity *could file a claim within the one-year period* permitted by § 13(a) *yet defer litigation of the claim* indefinitely until a capacity-loss manifested itself, thereby undercutting our inference from the limitations provision that present disability must be conceived as including the potential for future decline in capacity. But *it seems unlikely that when Congress enacted § 13(a) it intended workers to be able to file claims before they could establish all the elements entitling them to compensation.* Moreover, while the practical effect of *permitting protective filings* and indefinitely deferring adjudication is in one respect the same as *awarding nominal compensation* when there is a significant possibility of future capacity loss, in that *both approaches hold open the possibility of compensating a worker when the potential future economic effects of his injury actually appear,* the former approach, unlike the latter, has the defect of putting off the adjudication of every element of the worker's claim, including such matters as the work-related nature of the injury, until long after the evidence grows stale. We therefore think that the inference we draw from the limitations provision is the better one.

*Id.,* n. 2 (emphasis added).

In contrast, Justice O'Connor (joined by Justices Scalia and Thomas) concluded:

I part company with the Court first because in my view, § 8(h) of the LHWCA, 33 U.S.C. § 908(h), requires an administrative law judge (ALJ) to make an up-front finding that "fix[es]" the worker's wage-earning capacity (and hence his eligibility for compensation) by taking into account both the worker's present and future ability to earn wages. Second, a finding of future economic harm must be supported by a preponderance of the evidence pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., in order to affect a claimant's wage-earning capacity. Finally, because I read the ALJ's decision as expressly finding that respondent Rambo will probably suffer no future loss of earning power, and because that finding is supported by substantial evidence, I would reverse the decision of the Court of Appeals and direct the entry of judgment for petitioner Metropolitan Stevedore Co.

*Id.*, at ——, 117 S.Ct. at 1965 (O'Connor, J., dissenting).

The issue presented by the present litigation is one as to which consensus is not to be expected either in the Supreme Court or elsewhere. My purpose throughout pretrial developments and trial of this case has been to develop the record, in every respect likely to be viewed by higher courts as relevant to the final outcome of the case, under whatever resolution they may reach on reasonably disputable issues regarding the meaning of statutory provisions that may be invoked by any of the litigants.

## IV. LEGAL ISSUES ARISING WHEN LITIGATION COMPLEXITY DEPARTS FROM TRADITIONAL TORT AND CONTRACT PARADIGMS

### A. Increasing Incidence of Departures From Traditional Paradigms

#### 1. A Future Event as an Element of a Legal Test

As *Metropolitan Stevedore* illustrates, the present case is not at all unique, in the legal system, in presenting a kind of problem for decision as to which practical reasons exist for a lawmaking determination of the unsuitability of a legal test for determining the final outcome of a case (or some important aspect of the case) that uses a future event (or an identified set of future events) as an element of the test. In few if any instances will a finder of fact be able to predict with any degree of confidence that the relevant future event will or will not occur.

In paradigm tort and contract jury trials, the jury, in arriving at their verdict, must decide whether they find by a preponderance of the evidence that future events, bearing upon extent of harm caused by a tort or breach of contract, will occur, as the plaintiff has contended. Inevitably the jury's predictive findings seldom if ever turn out to be precisely accurate as events unfold.

The common law initially, and as well statutes and procedural rules of more recent time, provide for adjudicative revision of the jury's findings of damages only in very exceptional circumstances. The underlying policy choice of lawmakers has been, instead, to treat the jury's predictive finding as final and decisive.

#### 2. Lawmaker's Policy Options

Very different policy considerations have been advanced, however, in a varied and increasing number of controversies that are far more complex than paradigm tort and contract cases. The considered choice of lawmakers may be, for some at least of these more complex controversies, both to define in a different way what it is the finder of facts is *to find* and to define in *some way other* than "preponderance of the evidence" the measure of confidence the finder of facts must have to make the finding.

### B. Analogies in Legal Reasoning

#### 1. Circumstances of Uncertainty About *Past Events* and Evaluation of *Past Conduct*

In searching for analogies that might provide guidance in relation to the issues in this case, I turn first to a context in which the practicalities of reaching decisive outcomes in the face of uncertainty relate to inevitable uncertainty about past events and evaluation of past conduct. Precedents for departure from the traditional tort-contract paradigm in relation to findings about the past may be

evaluated as relevant more broadly in this case because the distinction between past and future events makes past-event departures even more compelling support for reconsidering the content and structure of legal tests concerned with prediction of future events.

Criminal sentencing is a context in which this kind of explicit reconsideration by lawmakers has occurred, in relation to findings about past events and evaluative findings about degrees of culpability associated with past events. In that context, as in the present toxic waste remediation case, some important findings about past events and evaluations of conduct of parties must be *quantitative* in nature. Developments in the law bearing on sentencing speak to the problems associated with making findings about quantities as to which precision is inevitably not achievable. Thus, for example:

When making findings under a preponderance of the evidence standard about quantities (whether quantities of controlled substances, or quantities determining a restitutional obligation, or quantities of foreseeable "loss" or "value" with respect to, for example, stock in a corporate entity or bank "checks" or "credits"), the finder of facts may evaluate the evidence as insufficient to support a finding that it is more probable than not that the quantity was more than some particular numerical minimum in a prescribed "level" of a guideline sentencing table.

*United States v. Fulton,* 960 F.Supp. 479, 496 (D.Mass.1997).

This development in criminal sentencing occurred through a statutory mandate to an agency (The United States Sentencing Commission) for that agency to promulgate guidelines that provided somewhat greater specificity than did the statutory provisions themselves. Both the statute and the Commission characterized what the Commission promulgated as "guidelines." The statute and Commission promulgation, taken together, left much to courts to work out by decisional processes like those of the common law method. A court decision of this kind, made with guidance from other sources of legal authority, has more or less force as

precedent, depending on the role of the deciding court in the hierarchy of courts, on the nature and content of the guidance, and on the nature and content of the court's reasoned explanation of its decision.

In several other contexts precedent already exists for the fashioning of new kinds of legal tests by statute, or by administrative action under statutory authorization, or by judicial decision where no other source of authority has provided essential guidance.

The response of the legal system to claims of injuries to infants from DPT vaccines is an example. A very small percentage of all the infants to whom DPT vaccine is administered quickly develop disabling conditions that health care professionals who have provided services to or for the infant commonly attribute to characteristics of the vaccine, or to the choice of some health care provider to administer it, or to the method of administration.

Also, another small percentage of the infants to whom the vaccine is administered develop disabling conditions first diagnosed years later. Inevitably great uncertainties exist in these cases, when first they are presented in any forum for an adjudication of legal responsibility. The uncertainties concern both past facts relevant to legal accountability and predictions about future consequences. Among the uncertainties is likely to be a lack of information about which among all the manufacturer-marketers of the vaccine was the source of the particular vaccine that was administered to the infant whose disability is first diagnosed years later.

In these circumstances, manufacturers and marketers of DPT vaccines publicly expressed, in the 1980s, expectations of withdrawal of DPT vaccines from the market, creating concerns about complete disappearance from the market of DPT vaccines in the absence of governmental action, state or federal, to resolve the "crisis." Congress responded by enacting the National Childhood Vaccine Injury Act of 1985. That Act has features that to some extent, and in defined circumstances, displace claims for compensation under state tort law criteria in a "trade-off." *O'Connell v. Shalala,* 79 F.3d 170, 173

(1st Cir.1996).. *See also Schafer v. American Cyanamid Co.*, 20 F.3d 1 (1st Cir.1994). The "tradeoff" includes a grant, to a child who has suffered a kind of injury presumed to be causally tied with DPT vaccine, and family members qualifying for consortium-like claims, very substantial economic benefits measured by criteria ("elements") that must be satisfied to prove a claim legally recognized under the Act. The findings required to satisfy these "elements" are *not* things that could *never* be found by a preponderance of the evidence because of the high degree of uncertainty about both past events and future events that are traditionally relevant under paradigm state tort law claims. Instead, the Act establishes other criteria as to which proof is possible, at least in a substantial percentage of all cases of childhood vaccine injury. *See id. See also Shackil v. Lederle Laboratories*, 116 N.J. 155, 561 A.2d 511 (1989).

### 2. Circumstances of Uncertainty about *Future Events*, Consequences, and Costs of Remedies

Predictions about future events are inherently less likely to be precisely correct than factual findings about past events, even when all accessible evidence is placed before the person or group of persons making the factual predictions and findings.

Sources of guidance in statutes and precedents leave trial courts without any settled rules they can invoke to decide what impact these inevitable uncertainties have upon the outcome of a case such as the present case, involving claims of "settling parties" against "non-settling parties" for contribution of shares of future remediation costs.

Developments in other areas of law, however, may serve as analogies. Developments that appear most useful in this case are discussed in Part V.B.3, below.

## V. MORE ABOUT STATUTORY AND DECISIONAL GUIDANCE ON SHARES OF ACCOUNTABILITY UNDER CERCLA AND SARA

### A. Examining Statutory Text as a First Step

■ To begin a more thorough inquiry into authoritative guidance for deciding the legal questions this case presents, I turn to the statutory text bearing on shares of legal responsibility for past and future remediation costs under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (1987), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub. L. No. 99-499, § 101 et seq., 100 Stat. 1613 (1986).

This method of commencing with statutory text is thoroughly supported by precedents that have developed in a wide range of other contexts. *See, e.g., Metropolitan Stevedore, supra* (Longshore Workers' Compensation); *In re Bajgar*, 104 F.3d 495, 497 (1st Cir.1997) (applying this method in the context of the bankruptcy statute); *Strickland v. Comm'r, Maine Dept. of Human Services*, 48 F.3d 12, 17 (1st Cir.1995) (looking to statutory text in reviewing an administrative agency's interpretation of the statute); *Heno v. FDIC*, 20 F.3d 1204, 1207 (1st Cir.1994) (applying this method to interpretation of FIRREA); *Telematics Int'l Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 706 (1st Cir.1992) (same).

CERCLA and SARA, when read in a sense consistent with ordinary meaning of the words Congress used, contain unmistakable manifestations that in some instances at least, and perhaps in most, determinations of shares of accountability for remediation costs will not be made until years or even decades after the EPA, acting alone or after reaching a settlement agreement with some of the potentially responsible parties, develops a remediation plan, or approves one proposed by settling parties. One such manifestation is inherent in the specific provisions for re-evaluation as remediation progresses and the work done discloses more and better information about what remains to be done. The added information developed as the work proceeds enables gradually improved predictions about what more must be done to accomplish the prime objective of removing toxic substances, or effectively "containing" them (for example, by laying down an impermeable "cap" that will stop atmospheric emissions and pumping into underground

placement impermeable barriers to underground movement).

The instinctive reaction that "containment" must be very expensive, and sometimes unpredictably expensive, has been reenforced by reported experience. The cost of precluding escape into the environment, with consequences of additional harm, is seldom if ever predictable with precision, but both the costs of precluding escape and the costs of bearing consequences if escape is not precluded are certain to be high.

This conclusion is supported by the statutory text bearing upon a reservation by EPA of the right to make further claims, as part of a settlement agreement of the kind in evidence in this case. *See* Ex. 106. In the section concerning settlements between the EPA (as the President's delegate, *see* 42 U.S.C. § 9606(a), quoted in Part III.B, above) and potentially responsible parties, the statute declares:

> Except for the portion of the remedial action which is subject to a covenant not to sue under paragraph (2) or under subsection (g) of this section (relating to de minimis settlements), *a covenant not to sue a person concerning future liability to the United States shall include an exception* to the covenant that allows the President to sue such person concerning future liability resulting from the release or threatened release that is the subject of the covenant *where such liability arises out of conditions which are unknown at the time the President certifies* under paragraph (3) *that remedial action has been completed at the facility concerned.*

42 U.S.C. § 9622(f)(6)(A) (emphasis added).

Without doubt, some ambiguities do exist in § 9622(f)(6)(A). For example, what, precisely, is the meaning of the word "unknown"? One among the possible interpretations of the word "unknown" is that it is a statutory recognition that the President, and the EPA as the President's delegate, did not have sufficient information to determine, with confidence approaching that implicit in a finding by a preponderance of the evidence, a particular potentially responsible person's equitable share of accountability for the President (or the EPA as the President's

delegate) to certify "that remedial action has been completed at the facility concerned."

In any event, regardless of ambiguity of statutory provisions in other respects, the excerpts quoted here and in Part III.B, above, underscore the point that relevant statutory provisions manifest a policy choice against applying, in identified categories of CERCLA and SARA cases, the legal rule of finality that traditionally applies to an award of damages for future harm or loss in the paradigm tort or contract judgment.

A court must accept this statutory mandate for a reserved right for EPA to make additional claims as it learns more about what will be a suitable plan of remediation, what the costs will be, and against what entities and in what equitable shares EPA might reasonably make claims. In deciding a particular controversy, a court must work within a limited range of choice. As a practical matter, after taking the statutory mandate into account, the court is limited to

(a) declaring that a claim is not supported by sufficient evidence (because the evidence does not enable a finder of fact to decide, with a requisite degree of probability, that all facts relevant to the claim will occur), with the consequence that the claim is premature and must be dismissed, with or without prejudice, or

(b) declaring that some presumptive rule applies (which may be an all-or-none rule or instead, for example, an equal-sharing rule) because no party has offered evidence sufficient to rebut the presumption, or

(c) making provisional determinations of fact and law (about shares, or dollar costs, or both) supportable, as to factual elements, only on a basis short of a preponderance of the evidence, and making an order accordingly.

In substance, one possible choice in this limited range is for the court, by formal order, to declare that the provisional determinations it makes will be subject to reexamination in the future after more information (not accessible to the parties and the court at the time of the provisional determinations) becomes known. This kind of order may or

may not be a "final judgment" in a sense relevant to appealability in ordinary course and in the ordinary way, rather than by extraordinary writ.

Choice (a) among these three may be described as a choice for rough-and-ready, bright-line, hard-edged law, placing more emphasis on speedy and inexpensive adjudication than on fair and equitable adjudication. Choice (b) is also a rough-and-ready, bright-line, hard-edged rule, placing emphasis on speedy and inexpensive adjudication, but the adverse consequences it imposes on the party who has the impossible burden is less severe simply because it is a sharing rule rather than an all-or-none rule.

Early common law precedents supported an all-or-none rule, denying contribution among wrongdoers. Admiralty law, on the other hand, has long supported dividing damages in collisions where both vessels are at fault. *See* Gilmore and Black, *The Law of Admiralty*, 492 and n. 41 (2d ed.1975). Under the traditional rule of admiralty, where both vessels were at fault, each vessel bore half the total damages. *See id.* The rationale for this rule was that the less injured vessel would pay more to the more injured vessel. *Id.* In 1975, however, the Supreme Court rejected the "divided damages" rule, substituting for it a rule allocating shares proportional to degrees of accountability. *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715–16, 44 L.Ed.2d 251 (1975) (holding that where two or more parties to a collision are at fault, "liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.").

In the 20th century, statutes and precedents have moved toward some form of sharing. Today, the great majority of states provide (by statute, precedent, or a mixture of the two) for contribution in some form. *See* American Law Institute, *Restatement of the Law of Torts: Apportionment of Liability,* § 7 and Reporter's Note (September 18, 1996). Sharing on a basis proportional to fault, or on a basis of causal contribution, or on a basis of some mixture of the two, is the prevalent rule. *Id.* at § 20 (describing different schemes of apportionment of damages). Substantial support exists, however, for a rebuttable presumption of equal shares among all contributors to a harm or loss, along with a softened burden that allows the finder of facts to allocate shares determined by reasoning from evidence even though the evidence falls short of enabling the finder to calculate shares with the degree of precision required by traditional rules of common law or admiralty that direct that factual findings be made by a preponderance of the evidence. *See, e.g., Loui v. Oakley,* 50 Haw. 260, 438 P.2d 393, 396–97 (1968) (holding that where it is impossible for a jury to determine, by a preponderance of the evidence, a particular defendant's share, the jury "may make a rough apportionment" under a lesser burden of proof, and, where a rough apportionment is impossible, the jury must divide the damages equally among tortfeasors); *Maddux v. Donaldson,* 362 Mich. 425, 108 N.W.2d 33 (1961). *See also* W. Page Keeton, et al., *Prosser & Keeton on Torts* at 348–51 (5th ed.1984).

These 20th century developments have moved the center of gravity of developed rules toward choice (c).

Choice (c) is a choice for accepting the consequences of delay and greater expense of final adjudication in order to come closer, in a category of exceptionally complex controversies, to the statutorily manifested aim of fair and equitable allocation of legal responsibilities. This is a choice especially appropriate for consideration in relation to remediation of toxic waste sites.

In the toxic waste disposal context, the core question is how to allocate shares when the parties cannot prove the exact or even approximate shares of each party because of the passage of time and the synergistic effects of many types of wastes, many waste sources, and many other factors contributing to the severity of consequences for particular parties, for the community at large, and for all other persons and entities having legitimate interests in toxic waste remediation.

CERCLA and SARA are not as explicit about the choice among methods (a), (b), and (c) as was, for example, the Childhood Vaccine Injury Act, cited in Part IV of this opinion, above. Courts thus have less statutory guidance, but no less responsibility, for working out an answer to the basic choice among these methods and then, of course, working out all the necessary details of implementing and applying the choice made.

In this instance, I conclude that choice (c) is more likely the choice that will be made by higher courts as cases come before them. The reasons for this conclusion are mostly implicit, if not explicit, in characteristics of this controversy explained in earlier parts of this opinion and in each of the two preceding opinions in this case. The following explanation refers to, without repeating fully, the most relevant points developed there and calls attention briefly to additional supporting points.

One way of describing and implementing this choice is to start with a presumption that, once a party is found to be liable, that party is to be assigned an equal share. This starting presumption may be rebuttable by either party, however. The lawmaking choice may be to ease the burden of proof for rebuttal of the presumption, rather than using the traditional preponderance-of-the-evidence standard. Thus, for example, the presumption might be held to be rebuttable by credible evidence sufficient to enable the finder of facts to make an estimate of the appropriate share, reasoned from evidence, even if there is no preponderance of the evidence to support precisely that share. In other words, proportional allocation may be allowed for a party if that party shows any reasoned basis for making an estimate as to that party's proper share.

Under this method, the Final Judgment will be provisional as to costs to be incurred in the future. Either party may file with the court, when good cause to do so has developed factually, a motion supported by a showing of a material change in circumstances that justifies a change in the allocation of shares among the parties. Compare the directions to lower courts in the judgment of the Supreme Court in *Metropolitan*

*Stevedore, supra,* —— U.S. at —— –——, 117 S.Ct. at 1963–64.

Before determining whether a provisional judgment of this nature would be appropriate in this case, as to shares of future remediation costs, the court invited submissions by the parties, written and oral, addressing analogies called to their attention in oral hearings, and any additional arguments not previously considered in this case.

## B. More Guidance by Analogy

### 1. Introduction

The prime issues to be decided in this case concern what are fair and equitable allocations of shares of accountability for remediation costs already incurred at the OU No. 1 and OU No. 2 sites and future remediation costs at each of these sites.

Some issues bearing upon past costs and future costs at both sites were tried during the jury phase of trial proceedings in this case. This section concerns some aspects of these issues.

Issues distinctive to the OU No. 2 site, tried, in a later phase of trial proceedings without a jury (by stipulation of the parties, approved by the court), were addressed in oral findings stated on the record during proceedings on July 17–18, and 21–23, 1997, and are discussed briefly in Part VI below. Also deferred to a later part of this opinion is consideration of analogies in the very sparsely developed law governing "judgment proofing" incidents, especially in contexts of tort-like or contract-like claims first emerging, for practically understandable reasons, decades after allegedly accountable acts and activities occurred on behalf of legal entities that, when litigation commences, are no longer formally in existence.

### 2. Already Incurred Remediation Costs at OU No. 1 Site

Part II of this opinion explains why the evidence received under court rulings for jury consideration was sufficient to support jury findings by a preponderance of the evidence that conduct of CDE was a cause in fact, along with other causes in fact, of costs of remediation in amounts sufficient to support the damages findings made by the jury

with respect to remediation costs already incurred by plaintiffs, up to the date of the verdict, at the OU No. 1 site.

Remaining for consideration are those aspects of legal cause (or "proximate" cause), other than cause in fact, and issues bearing upon what are shares of legal responsibility, enforceable in a contribution action as distinguished from a civil action for remediation initiated by the EPA, and based upon the statutory phrase, "equitable factors."

Defendant CDE contends (as an alternative, of course, to its primary contentions that it was entitled to judgment as a matter of law on more basic grounds rejected by this court) that the court should read CERCLA and SARA as requiring plaintiffs to show a precisely determinable allocation of shares by a preponderance of the evidence (at minimum, if not to a greater degree of certainty). I conclude, instead, that such a hard-edged requirement is incompatible with the statutory mandate for fairly determined shares based upon "equitable factors."

■ Inherently, the concepts of fairness and equity imply a judicial responsibility for making discretionary choices rather than applying hard-edged rules that leave no discretion to take into account all of the circumstances of an individual case beyond merely those facts identified as factual premises of the hard-edged rule. A court, in seeking to understand the meaning of a statutory mandate, should not invoke a counterfactual presumption of congressional intent in the face of overwhelming circumstantial evidence that no reasonably well informed observer would have thought that accessible evidence would be available, either to the parties or to the court, to prove required facts by a preponderance of the evidence. This point applies to any set of precisely calculated shares of responsibility, based on equitable factors, even for remediation costs already incurred by the time the decision is made and a judgment is to be based upon that decision. It has special force in relation to a site having the characteristics of a municipal dump where waste disposal comparable to that at Sullivan's Ledge had occurred for decades before anyone took seriously the developing environmental hazard, and decades more before anything approaching effective remediation was initiated. Once implausible counterfactual assumptions are put aside, the only option remaining is to fashion ways of determining shares that do not depend upon coming to an impossible degree of certainty that the shares allocated are perfectly fair. In short, the mandate is that shares assigned on a basis that cannot be demonstrated to be precisely correct will come closer to the aim of shares based on equitable factors than will shares assigned on an *all-or-none* basis for each party, with the consequence that the outcome is certain to be all against the party on whom the law places the impossible burden of proof.

Analogies in support of this kind of decision appear in the developed and developing cause-in-fact rules discussed in Part II.C of this opinion.

### 3. Shares of Accountability for Future Remediation

Scarcity of accessible and probative evidence that bears upon shares of responsibility based on equitable factors is more pronounced, by orders of magnitude, with respect to *future* remediation costs. Thus, all that has been said in support of some alternative to hard-edged rules requiring proof of specific facts by a preponderance of the evidence in the context of past costs applies with greater force to rules about shares of responsibility for future remediation, based upon equitable factors.

Additional support for an alternative to hard-edged rules and ordinary burdens appears in developed rules with respect to equitable sharing of liability insurance proceeds among judgment creditors. Moreover, developed and developing rules extend this principle, in some contexts, to claimants generally rather than judgment creditors only. In the liability insurance context, the problem arises when liability insurance coverage is subject to a per-accident or per-incident cap and multiple claims will far exceed the cap. *See, e.g., Moore v. McDowell,* 54 Mich. App. 657, 221 N.W.2d 446 (1974) (equitable principles motivated a pro rata distribution of funds deposited in court by a liability insurer despite the status of some claimants as judg-

ment creditors); *Burchfield v. Bevans*, 242 F.2d 239 (10th Cir.1957); Robert E. Keeton and Alan I. Widiss, *Insurance Law* §§ 7.4(d)–(f) (1988).

Another context of analogical support for determining equitable shares, at least on a provisional basis, before a time arrives when the court can do so on findings by a preponderance of the evidence, arises under the admiralty jurisdiction of United States district courts in exoneration proceedings. The owners of the offending vessel tender it into court (or tender insurance proceeds equal to the full value of the vessel just before a disaster) with a request for exoneration of the owners from liability in excess of the value of the vessel. In a previous civil action presenting such a clash of equities, I have concluded that a court may make an order provisionally allocating shares of benefits among claimants and authorizing immediate partial payment of limited benefits to surviving dependents, consistent with the provisional allocation. *See, e.g., In re The Complaint of Uncle Sam of '76, Inc.*, 928 F.Supp. 64, 65–66 (D.Mass.1996). No good reason appears for not invoking a similar procedure with respect to shares of responsibility as well as shares of benefits.

## C. Analogies from the Law Governing Disappearing Entities and Judgment–Proofing Incidents (Including Rules Associated with Mergers, Acquisitions, and Asset Transfers)

A provisional determination of responsibility for future costs due to past waste disposal is necessitated, in part, by recognition of the fact that certain business transactions might have the effect of precluding the plaintiffs from collecting upon any judgment when the future costs materialize. Commentators and legal practitioners have grappled with this problem in other contexts, and have suggested means by which a plaintiff's rights may be protected.

One academic commentator has referred to thoughtful planning to avoid surviving accountability to either a predecessor or a successor entity for liabilities for the activities of the predecessor as "judgment-proofing strategies." Lynn M. LoPucki, *The Death of*

*Liability*, 106 Yale L.J. 1 passim (1996). Even if they are not carefully planned with this objective, transactions may have "judgment-proofing consequences."

The need for substantive law rules to protect against transactions and events that have "judgment-proofing consequences" is apparent in the area of future legal accountability for *past* toxic waste disposal.

The same need for protection has been recognized in the area of products liability. A comment to the opening section of the ALI's Proposed Final Draft of the Restatement (Third) of Torts on Products Liability identifies, as a principle limiting the scope of tightening the standard for Products Liability, an objective that the law assure "plaintiffs access to a responsible and solvent product seller or distributer." Restatement (Third) Torts: Product Liability § 1 cmt. e (Proposed Final Draft, April 1, 1997). The comment adds that state statutes immunizing nonmanufacturing sellers or distributors from the strict liability otherwise imposed on them by common law for defects occurring during manufacturing generally grant that immunity to the nonmanufacturer

> only if: (1) the manufacturer is subject to the jurisdiction of the court of plaintiff's domicile; (2) *the manufacturer is not, nor is likely to become insolvent; and (3) a court determines that it is highly probable that the plaintiff will be able to enforce a judgment against the manufacturer.*

*Id.* The comment calls attention, also, to two special problems about applying this immunity, even when all these three requirements may, on first inquiry, appear to be satisfied.

> First, as currently structured, the statutes typically impose upon the plaintiff the risk of insolvency of the manufacturer between the time an action is brought and the time a judgment can be enforced. If a nonmanufacturing seller or distributor is dismissed from an action at the outset when it appears that the manufacturer will be able to pay a judgment, and the manufacturer subsequently becomes insolvent and is unable to pay the judgment, the plaintiff may be left to suffer the loss uncompensated. One possible solution could be to toll the

statute of limitations against nonmanufacturers so that they may be brought in if necessary. Second, a nonmanufacturing seller or distributor occasionally will be responsible for the introduction of a defect in a product even though it exercised reasonable care in handling or supervising the product in its control. In such instances, liability for a § 2(a) defect should be imposed on the nonmanufacturing seller or distributor.

*Id.*

The concern with protecting the ability of plaintiffs to collect on judgments for claims that arise in the future is also echoed in § 12 on Liability of Successor for Harm Caused by Defective Products Sold Commercially by Predecessor. This section of the Proposed Final Draft of April 1, 1997 provides:

> A successor corporation or other business entity that acquires assets of a predecessor corporation or other business entity is subject to liability for harm to persons or property caused by a defective product sold or otherwise distributed commercially by the predecessor if the acquisition:
>
> (a) is accompanied by an agreement for the successor to assume such liability; or
>
> (b) results from a fraudulent conveyance to escape liability for the debts or liabilities of the predecessor; or
>
> (c) constitutes a consolidation or merger with the predecessor; or
>
> (d) results in the successor's becoming a continuation of the predecessor.

*Id.* § 12.

The comments in the Proposed Final Draft of Restatement (Third) interpret the majority of the precedents as supporting the view, which the Restatement adopts, that a successor should not be held liable for harms that it did not cause. Thus, the Restatement rejects the contention that a successor who cannot be said to constitute a "continuation" of the predecessor should be held liable merely to increase a plaintiff's chance of recovery. *Id.* comment b. To the extent that CERCLA and SARA provide that a successor corporation who owns a facility where hazardous waste was deposited will be liable even though the successor did not actually dispose of the waste, *see* 42 U.S.C. § 9607(a)(1), the statutory provisions express a choice for somewhat greater successor liability than is either the choice manifested in precedents or the choice supported by the ALI commentary.

### D. The Impact of Incentive Structures on Determining the Allocation of Future Remediation Costs for Past Hazardous Waste Disposal

When fashioning a legal rule to be applied in determining shares of responsibility for protecting against future migration of underground deposits of hazardous substances, a lawmaker must be sensitive to the susceptibility of any legal rule to planned avoidance. A substantial body of academic commentary has developed this point persuasively in the context of retroactive lawmaking of many types, accomplished by lawmaking officers of all branches of government. A major contributor to this body of commentary, using government revenue enactments as an example, observes:

> Rules that impose new fees or taxes typically assume a base set of transactions to which the rule will apply. If people can avoid the rule by accelerating their transactions, the government's revenue goals will be harder to achieve.

Jill E. Fisch, *Retroactivity and Legal Change: An Equilibrium Approach*, 110 Harv. L. Rev. 1056, 1089 (1997).

Fashioning a rule of law, for CERCLA and SARA cases, under which the method of allocating shares of responsibility favors "settling parties" over "nonsettling parties" will tend to accelerate settlement negotiations. This acceleration may not be altogether benign and impartial; it may have quite disparate impact on different parties (private and governmental) and different interests (public and private, economic and noneconomic). From each of many different perspectives, encouraging acceleration of negotiations may be either better or worse than encouraging broader participation and more deliberation.

Immediately following the observation quoted above, Professor Fisch adds:

Similarly, efforts to avoid new legal rules may result in allocational inefficiency, provide windfalls to parties who can anticipate the legal change, or create disparate treatment for similarly situated transactions. Opportunistic avoidance of new legal rules is important outside the tax context as well. Removing transactions that would otherwise be covered by a legal change reduces the influence of all government regulation. For example, if people can avoid new building codes by starting construction before legislation is signed, the capacity of legislation to enhance safety standards is reduced.

*Id.* These observations apply to the incentive structures, whether intended or unintended by lawmakers, that may result from rules fashioned for allocating shares of costs of remediation of toxic waste sites based on "equitable factors."

Professor Fisch focused her probing primarily upon "retroactivity doctrine." In concluding her observations on that subject, she remarked:

> Casting the retroactivity debate in terms of the respective responsibility of Congress and the courts for effecting legal change leads to an inquiry into comparative institutional competence.

*Id.*, 110 Harv. L. Rev. at 1122.

This observation, too, applies more broadly than just to retroactivity issues. It applies as well, and perhaps even more strikingly, to the distinctive problems of developing a suitable and effective response of the legal system to the needs for *future* remediation of *past* deposits of toxic waste.

## E. Bringing Together Factors Bearing on the Substantive Nature of the Final Judgment in This Case

In several other contexts, in the 1980s and 1990s, the Supreme Court has developed a body of precedent that takes account of the distinctive positions of competence of different kinds of lawmaking officials to make special kinds of contributions to fashioning and implementing the legal system's coordinated response to a particular problem. Describing these developments from another perspective, one may say that a growing body of precedent recognizes that the legal system's allocation of decisionmaking responsibility may depend on considering who, among the potential decisionmakers, is "better positioned" to decide a key issue of implementation consistently with a basic policy mandate in a constitutional provision or a statute. *E.g., Markman v. Westview Instruments, Inc.*, —— U.S. ——, ——, 116 S.Ct. 1384, 1393, 134 L.Ed.2d 577 (1996) (noting that, "[s]ince evidence of common law practice at the time of the Framing does not entail application of the Seventh Amendment's jury guarantee to the construction of the [patent] claim document, we must look elsewhere to characterize this determination of meaning in order to allocate it as between court or jury," and holding that existing precedent, the relative interpretive skills of judges and juries, and statutory policy considerations favor allocating construction issues to the court). *See also Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 501 n. 17, 104 S.Ct. 1949, 1960 n. 17, 80 L.Ed.2d 502 (1984) ("A finding of fact in some cases is inseparable from the principles through which it was deduced. At some point, the reasoning by which a fact is 'found' crosses the line between application of those ordinary principles of logic and common experience which are ordinarily entrusted to the finder of fact into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment.").

Another relevant perspective is stated in a more recent opinion:

> [T]he Constitution blends, as well as separates, powers in its effort to create a government that will work for, as well as protect the liberties of, its citizens.

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 245, 115 S.Ct. 1447, 1465, 131 L.Ed.2d 328 (1995) (Breyer, Jr., concurring in the judgment).

Professor Fisch cites Justice Breyer's observation in support of a "functionalist" rejection of a "theory," identified by Professor Fisch as "formalist," that "the Constitution sharply separates the powers accorded to each branch" of government in the American legal system. Fisch, *supra*, 110 Harv. L.

Rev. at 1080 and n. 152 (1997). Professor Fisch invokes a "metaphor of equilibrium," *id.* at 1100, in relation to her primary focus on *retroactivity* in all kinds of lawmaking. She develops that metaphor in ways that are instructive and potentially useful to decision-makers who occupy varied roles; she invokes, in support of both the metaphor and her thesis, an earlier seminal commentary, William N. Eskridge, Jr., Philip P. Frichey, *The Supreme Court, 1993 Term—Foreword: Law as Equilibrium*, 108 Harv. L. Rev. 26 (1994).

The metaphor of "equilibrium" seems less apt for lawmaking that is primarily significant *prospectively*. Nevertheless, the insights of Professors Eskridge, Frichey, and Fisch, and of other scholars who have commented on the growing need for contributions to lawmaking by governmental officials occupying different roles in the American legal system are relevant to issues of the kind presented to courts by the statutory mandates of CERCLA and SARA for judicial implementation of a system of shares of legal responsibility for *future* remediation of sites of *past* toxic waste disposal.

Professor Lawrence Lessig, using judicial interpretation of "environmental statutes" as an example, observes: "When there is interpretation of ambiguous statutes, there is interpretive lawmaking." Lawrence Lessig, *Erie–Effects of Volume 110: An Essay on Context in Interpretive Theory*, 110 Harv. L. Rev. 1785, 1798–99 (1997). Professor Lessig contrasts delegation of the kind occurring in "environmental statutes" with a choice in a legal system "to delegate when the substance of the law delegated is narrow, and reflective, and law by default.". *Id.* at 1793.

The statutory mandates to the EPA and the courts in CERCLA and SARA belong in Lessig's more deeply substantive category. They concern changes in substantive law that are broad, not narrow; interpretive, not derivative; and overriding private choice, not simply declarative of default rules applying when private ordering leaves issues unaddressed. Moreover, the issues of interpretation and application of the statutory mandates as they bear upon the problems presented at a particular hazardous waste site, though narrow in the sense that they must be focused in part on particulars that make that site unique in some ways, are nonetheless more general too. They are more general not only because they are policy-oriented in the sense that they require judgments affecting interests beyond the conflicting substantive interests of parties who have made comments to the EPA, or adversary presentations to a court, on whose docket is filed a case within the court's jurisdiction as defined by statutes enacted within constitutional authorization. They are more general because they are also policy-oriented in the sense that the EPA decision and the court judgment will affect substantive interests of a larger community than the parties can "adequately" represent, *see* 42 U.S.C. § 9613(i), in their comments to the EPA and their advocacy before the court.

The statutory mandates for implementation and application to particular hazardous waste sites, addressed in part to the EPA and in part to the courts, are nevertheless there, and, to the full extent they are within constitutional authorization, they are the substantive law applicable to disputes arising from hazardous emissions from that site.

■ Courts must honor and respect the mandate of CERCLA and SARA for ordering shares of legal responsibility for future remediation of past toxic waste disposal in a way that is grounded on "equitable factors." 42 U.S.C. § 9613(f)(1). In fashioning a judgment that is consistent with this mandate and the mandate that claims of settling parties for contribution "shall be governed by federal law," *id.,* a United States district court, when fashioning a judgment, must also take into account the concepts of "awarding nominal compensation," permitting "protective filings," and the relationship between these and other ways of responding to the impossibility of arriving at preponderance-of-the-evidence predictive findings, as explained in *Metropolitan Stevedore*. *See* Part III.C, above.

Taken together, the statutory mandates and the analogies in precedent lead me to conclude that the rulings reflected in the verdict form and charge in this case were appropriate, that the verdict was sensible,

fair, and supported by the evidence, and that the judgment should be in a form consistent with the concept of awarding compensation provisionally and with reasonable opportunity for any interested party to initiate later proceedings to modify the provisional allocation of equitable shares of legal responsibility for future remediation costs for good cause shown on the basis of evidence not now accessible.

## VI. RESPONSIBILITY FOR OU NO. 2 REMEDIATION

### A. Introduction

During the phase of nonjury trial regarding claims associated with remediation at the OU No. 2 site, the court received additional evidence, made rulings on admissibility of evidence and on motions presented orally as well as motions filed in writing, and after hearing oral arguments stated findings and conclusions orally on the record. A summary of key findings and conclusions is stated here.

Part VI.A summarizes key findings and conclusions bearing upon (i) contribution of hazardous materials to the waste stream that went into the quarry pits and adjacent surface areas of the Sullivan's Ledge site over the decades when it was used for waste disposal, and (ii) the extent to which, if at all, the acts of the various contributors were causes in fact and substantial factors in producing a need for remediation at the OU No. 2 site.

Part VI.B summarizes findings and conclusions with respect to various grounds on which CDE challenged the decisions of the administrative agency (EPA), with respect to remediation at the OU No. 2 site, and the role of courts generally, and this court in particular, associated with judicial review of various aspects of EPA decisions regarding remediation and responsibility for remediation at Sullivan's Ledge, and more particularly at what eventually came to be designated as sites OU No. 1 and OU No. 2 respectively.

Part VI.C concerns miscellaneous other matters as to which rulings were made and findings and conclusions stated in the July 1997 proceedings that immediately preceded

the fashioning of the precise terms of the Final Judgment.

### B. Contributors and Accountability
#### 1. In General

The contributors to the waste stream at Sullivan's Ledge included industrial users of the site for waste disposal, non-industrial users, the City of New Bedford, and its residents.

By a preponderance of the evidence, I find that CDE's deposits of waste materials containing PCBs, in the area that eventually came to be known as the OU No. 1 site, were a cause in fact of the presence of PCBs, in the area that came to be known as the OU No. 2 site, and were a substantial factor in producing a need for remediation at the OU No. 2 site.

Among the contributors of waste materials containing PCBs were the corporate entities referred to by counsel and the court during trial proceedings as the "AVX–Aerovox Group." Included in this group were AVX Corporation, a named plaintiff, and other entities that CDE alleged to be affiliated or associated in some way with AVX, among which were entities having "Aerovox" in the corporate title.

By a preponderance of the evidence, I find that the deposits of waste materials containing PCBs at the OU No. 1 site by entities within the "AVX–Aerovox Group" were a cause in fact of the presence of PCBs at the OU No. 2 site and were a substantial factor in producing a need for remediation at the OU No. 2 site.

Also, by a preponderance of the evidence, I find that all other deposits of PCBs at the OU No. 1 site, made by contributors other than CDE and the AVX–Aerovox Group, were together a cause in fact of the presence of PCBs at the OU No. 2 site and were a substantial factor in producing a need for remediation at the OU No. 2 site. These others include contributors as to whom even their identity cannot be determined by available evidence. of course, it follows that the dimensions of their contributions in quantity, toxicity, and durability cannot be found from the evidence in this case.

### 2. Plaintiffs' Request for Judicial Allocation of Shares *Among Plaintiffs*

■ As a matter of law, I reject plaintiffs' assertion that the trial court should undertake in this case to make allocations of shares of responsibility *among plaintiffs*, with respect to OU No. 1 remediation costs, past or future, or OU No. 2 remediation costs, past or future. This ruling is independently supported on several distinct grounds.

*First.* Plaintiffs, with full understanding of the choice they were making, voluntarily chose to join together in bringing this civil action for contribution against CDE and other defendants. They chose to be represented by attorneys they jointly selected and authorized to represent them jointly. The various plaintiffs had, and still have, obvious conflicts of interest among themselves with respect to any differential allocation of shares of legal responsibility among themselves.

■ I find, by a preponderance of the evidence, that these conflicts are not so deep as to make it impossible or impermissible for them to agree to a form of joint representation. They were free to forego pressing for judicial resolution of their conflicting interests and to agree that their common interest° in presenting a unified position against CDE and other defendants in this case so far outweighs their conflicting interests among themselves that they are better served by foregoing pursuit of conflicts and acting together.

In view of their choice for common representation, however, I find that the attorneys they have chosen are disabled from arguing to the court for any judicial allocation of shares among settling parties themselves; the attorneys would inevitably be preferring one client's interest over another client's interest in attempting to do so.

Moreover, the court would not have the benefit of a truly adversary presentation of the best possible arguments, based on proffers of the best available evidence, in support of each client's position. The most fundamental premise of an adversary system as a system aimed at fair disposition of disputes on the merits would be violated by a court's undertaking to allocate shares of responsibility among the plaintiffs in this case in these circumstances.

■ *Second.* The settlements reached among various groups of interested persons and entities, not including CDE, make it both inappropriate and unnecessary for this court to adjudicate any of the disputes of law and fact that were resolved among themselves by settling parties through choices by them to take the course of settlement rather than proceed to adjudication of disputed issues of law and fact.

The issues the settling parties resolved among themselves are no longer genuine cases or controversies. The plaintiffs now wish rulings on these issues not to have the court enforce a recovery by one against another of the settling parties contrary to their settlement agreement but to obtain an advisory ruling (about what their rights would have been had they not settled) so they could then use this ruling to ask this or another tribunal to hold that this court's declaration would bind CDE in ways contrary to its contentions, without CDE's ever being heard on the merits.

To the extent that they wish the court to rule that CDE, not a party to their settlement, is bound by its terms, they ask that CDE never have a chance to be heard on the merits. That would be a denial of fair process, whether or not the denial reached the dimension of unconstitutionality.

By their settlements, the settling parties have changed their incentives so they no longer wish to spend resources in engaging counsel to make appropriate investigation, followed by adversary preparation and presentation of evidence and legal argument that would be needed for the court to have a good basis for fair and appropriate adjudication on the merits without the court's undertaking itself an investigatory as well as an adjudicative role.

By agreements among themselves only, the parties to each of the settlements have changed the nature of any remaining conflicts of interest they have among themselves. No longer remaining are the pristine

controversies, which might or might not have been determined to be within the court's constitutionally-based jurisdiction. The controversies that survive are different, and may be different in ways the court could not expect to advised about candidly and openly by the parties in view of changed incentives.

■ The scope of the court's jurisdiction, defined in part by constitutional standards with respect to cases and controversies, is not subject to modification by agreements of parties. This principle applies even when an administrative agency with delegated authority from Congress has in some way been a party to one or more of the settlements, but without approval of a purported consequence that plaintiffs now wish to argue should flow from the settlement.

Parties may resolve their controversies among themselves, ordinarily without any approval by a court. Even if their pristine controversy was one over which the court had authority to accept jurisdiction (an assumption I do not undertake in deciding this case either to validate or to reject), it does not follow that they may redefine their controversy and place before the court a different set of claims (either their own claims or claims they hold derivatively) not shown by evidence of record in the case to be within the court's jurisdiction, as defined by the Constitution and Laws of the United States.

### 3. Equitable Shares of Responsibility

I find by a preponderance of the evidence that the evidence before this court, including all that placed before the court in the phase of trial before the jury as well as that received in the more recent proceedings, is insufficient to enable a finder of fact, whether court or jury, to determine equitable shares of legal responsibility with the degree of confidence implicit in findings made on a preponderance of the evidence.

■ Nevertheless, I find that I am able to make findings reasoned from all this evidence that are far more likely to be consistent with the truth about the nature and extent of each contributor's actions and resulting needs for remediation at the OU No. 1 and OU No. 2 sites than would be shares of responsibility determined on a per capita basis or on an all-or-none basis.

■ Reasoning from all the evidence before the court, on the basis just stated, even though not with the level of confidence involved in a finding by the preponderance of the evidence, I find that the most appropriate share of legal responsibility for CDE, stated as a percentage of the dollar costs of remediation incurred by plaintiffs at the OU No. 2 site (as to which plaintiffs and CDE reached a stipulation during the July 1997 proceedings) is fifteen (15.0) percent. This finding is based on the weighing of numerous factors, the most significant of which are those stated immediately below.

This is a different weighing of factors from that involved in the issue submitted to the jury on the evidence before them, focusing primarily on the OU No. 1 site.

CDE's overall deposits at the OU No. 1 site were mostly deeper deposits, though a limited part of CDE deposits remained at or near the surface. In contrast, to a far greater extent, the overall deposits of the AVX–Aerovox Group were at or near the surface.

Also, the same comparison applies to those among the overall deposits of CDE and the AVX–Aerovox Group that included PCBs.

The hazardous nature of the Sullivan's Ledge site was and remains even today an integrated problem. A close interrelationship exists among conditions at the two sites now designated as OU No. 1 and OU No. 2. They are parts of one large contamination problem, though separated for decisionmaking purposes (and quite appropriately so) by EPA, by parties in their advocacy, and by the court in addressing issues of law and fact presented in this case.

Both the need for remediation at the OU No. 2 site and the development of a plan of remediation consistent with the National Contingency Plan were driven primarily by the amount, pattern, and predictable durability of the PCB contamination that was found at the OU No. 2 site. I find by a preponderance of the evidence that well above 90% of the PCB contamination at the OU No. 2 site came to that site by migration from deposits

on the surface and at depths of the OU No. 1 site.

Both CDE and plaintiffs ask the court to assign to CDE a different percentage of responsibility as to OU No. 2 from that found by the jury as to OU No. 1. CDE's arguments for a lower share at OU No. 2 than its share at OU No. 1 are *not* supported by reasoning from evidence. Also *not* supported by evidence are plaintiffs' arguments for assigning to CDE a share at OU No. 2 *as much* higher than CDE's OU No. 1 share as plaintiffs claim.

The pattern of runoff from the OU NO. 1 site to the unnamed stream, and then through deposits of PCBs attached to soil, resulted in relatively more of AVX–Aerovox Group deposits of PCBs reaching the OU No. 2 site. The PCB deposits at OU No. 2 site were in a pattern of concentration consistent with patterns of sediment deposits incident to periodic flooding of the unnamed stream into the OU No. 2 site.

Minerals and other hazardous wastes deposited on the surface and at depths at the OU No. 1 site also migrated to the OU No. 2 site, primarily through periodic flooding, and contributed to a minor extent to the development of the full details of a remediation plan consistent with the National Contingency Plan.

· Weighing all the relevant factors identified in orally stated findings and conclusions, and summarized here, I find that CDE's share of OU No. 2 remediation costs should be more than a magnitude higher than its share of OU No. 1 remediation costs. I find it appropriate to require CDE to contribute to plaintiffs fifteen (15.0) percent of the remediation costs incurred by the plaintiffs.

## C. CDE's Challenges to the OU No. 2 Remediation Plan

### 1. EPA as a Party

■ Underlying all of CDE's challenges to the validity of EPA's remediation plan for the OU No. 2 site, as well as EPA's orders implementing that plan, is a premise that EPA need not be a party to a court proceeding in which, by one or more of the parties, the court is asked to engage in judicial review of a decision of the EPA. For reasons stated fully on the record during the July 1997 court proceedings and summarized here, I conclude that this underlying premise of CDE's challenges is inconsistent with statutory mandates.

A mandate initially enacted as part of SARA is explicit in declaring that

> [n]o Federal court shall have jurisdiction under Federal law other than under section 1332 of title 28 of the United States Code (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 (relating to cleanup standards) to review any challenges to removal [of contaminated soils, for example] or remedial action selected under section 9604, or to review any order issued under section 9606(a), in any action except [those specified in subparagraphs designated (1)–(5)].

42 U.S.C. § 9613(h).

The only one of the five subparagraphs relevant in this case is "(1) An action under section 9607 to recover response costs or damages for contribution."

The next following provision of the statute concerns intervention. It provides that any person "may intervene" if that person

> claims an interest relating to the subject of the action and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that person's interest is adequately represented by existing parties.

42 U.S.C. § 9613(i).

· CDE qualifies as a party having the kind of interest described in this provision of the statute. CDE, however, need not depend on a right to intervene; it is already a party.

The fact that CDE is a party, and would have a right to intervene if it were not, does not make EPA a party to this civil action. Implicit in the statutory provision is an assumption that EPA might intervene if it wished to do so (as the President's authorized delegate) for the purpose specified in

the statute—that is, to seek to show that CDE's interest is adequately represented. EPA has quite understandably chosen not to seek to intervene for that, or any other purpose. Also, EPA has quite understandably chosen not to respond to suggestions of the court, of record, that its participation would be welcomed by the court, since CDE has asked that the court engage in judicial review of EPA's decision and orders and declare them arbitrary and capricious.

The conclusion that this court does not have statutory authorization for the kind of plenary examination anew of issues of fact and evaluation that CDE urges in this instance is reinforced by a statutory "limitation," stated in the next section of the statute, with respect to the authority of a court that is engaging in the kind of judicial review that is authorized by the statute.

> In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.

42 U.S.C. § 9613(j)(1).

Relevant parts of the "[o]therwise applicable principles of administrative law" about "supplemental materials" that may be a part of the court record, even though not part of the administrative record, are explained in *Valley Citizens for a Safe Environment v. Aldridge,* 886 F.2d 458, 460 (1st Cir.1989) (Breyer, J.) ("It could happen that a particular instance of judicial review of an EIS raises a 'genuine' and 'material' dispute of facts that requires a trial: Did the agency know, for example, about some important matter that the EIS ignored?"). *See also Recupero v. New England Tel. & Tel. Co.,* 118 F.3d 820, 832–35 (1st Cir.1997).

In the present case, this court has adhered to the "[o]therwise applicable principles of administrative law" in making rulings on admissibility of evidence, explicitly distinguishing between evidence received to show what was in the administrative record and evidence received in the nonjury phase of trial

as part of the court record but not as part of the administrative record.

Only parts, not all, of the administrative record have been proffered and received in evidence in this case. The full administrative record is enormous, and includes materials in forms (for example, video and audio recordings) that have not been reproduced but that EPA allows to be examined where they are stored. Taking into account the conflict of views of witnesses and commentators qualified as scientists, appearing in the part of the administrative record that is before me, I find that this part of the administrative record is enough to disclose a lack of anything approaching scientific consensus about appropriate remediation and the reasoned basis for it. I cannot say, on this record, that the EPA decision or any order implementing it in relation to either the OU No. 1 or the OU No. 2 remediation is arbitrary and capricious.

The supplemental evidence received for the court record, but not as part of the administrative record, simply reinforces this determination.

If the foregoing reasoning of this court is accepted in higher courts, other grounds for rejecting CDE's challenges to the EPA's decision and implementing orders about OU No. 2 remediation become immaterial. I have nevertheless proceeded to address them in findings and conclusions stated of record in the July 1997 proceeding, and again briefly in this opinion, immediately below.

### 2. Consistency of the OU No. 2 Remediation With the National Contingency Plan

 CDE contends that plaintiffs have failed to show that "all costs of removal or remedial action incurred by the United States Government ... [are] not inconsistent with the national contingency plan," 42 U.S.C. § 9607(a)(4)(A), and that "any other necessary costs of response incurred by any other person [are] consistent with the national contingency plan," 42 U.S.C. § 9607(a)(4)(B).

CDE offered, at trial, expert testimony that it contends was not a part of the Administrative Record and was not considered by the EPA. CDE contends that, if considered,

this trial testimony requires as a matter of law a finding that plaintiffs have not met their alleged burden of showing that EPA's OU No. 2 remediation plan is "consistent with" and "not inconsistent with" the National Contingency Plan adopted by the agency, acting under the statutory mandate.

Ironically, as the evidence of record in this case shows, the expert testimony challenging the creditworthiness of EPA's reasoned explanation of its OU No. 2 remediation decision comes in its most assertive and dramatic form from a witness who had not only participated actively in the comments of scientists who expressed clashing views during EPA proceedings, but who also actively participated as a subcontractor consultant to EPA, several years before testifying in the 1997 proceedings in this case. This witness had expressed views at that earlier time that any impartial observer would be most likely to evaluate as materially inconsistent with the testimony given in these proceedings in 1997.

The record of this trial, as a whole, makes clear that the scientists who have participated as advisers and witnesses throughout the extended EPA investigation and hearings on the Sullivan's Ledge site have not been able to reach consensus on what advice to give at any selected time, or what opinions they should have given to EPA at any selected time. In these circumstances, the 1997 expert opinion of one or a few, among all these scientists, that the decision of the EPA was inconsistent with the National Contingency Plan and arbitrary and capricious for this and other reasons does not outweigh all the contrary opinions that were expressed during the EPA investigations and proceedings. EPA had authority to make a reasoned choice when presented with conflicting advice and conflicting expert opinions.

I find that the EPA decision was neither arbitrary nor capricious and that it survives judicial review. It is well supported by all parts of the administrative record brought to this court's attention. It is also supported by the additional evidence received for the court's consideration in the trial of this case.

▪ Evaluation of consistency of EPA decisions and orders with the National Contingency Plan must be made in a context that includes taking account of conflicting views among scientists and among all others, including the public generally, who have interests at stake. Statutory recognition of uncertainty and a delegation of authority to make a reasoned choice based on evaluation of clashing expert opinions, as well as evaluation of all the other relevant evidence before the agency, is implicit in statutory use of the word "contingency."

By a preponderance of all the evidence bearing upon this issue and the full context in which it arises, I find that EPA's OU No. 2 remediation plan is consistent with the National Contingency Plan.

### 3. The Charge That EPA's Decision Was Arbitrary and Capricious

▪ In making a determination as to the merit of CDE's overall contention that EPA's decision about OU No. 2 remediation was arbitrary and capricious (based on other grounds as well as that discussed above, regarding consistency with the National Contingency Plan), a federal court must approach the matter in the role of judicial review and not as if it were exercising plenary jurisdiction to decide anew all disputable issues of fact and evaluation, with no deference whatsoever to agency decisions.

▪ Applying this standard of review, I find that the agency's decision was within the bounds of reasoned and fair determination of the merits, that it was procedurally fair, that the agency fulfilled its obligation to state a reasoned explanation of its decision so judicial review can be properly accomplished, and that (contrary to the strident charges by CDE's expert witness that the stated reasons were not the real grounds of EPA's decision) the agency's reasoned explanation is creditworthy.

Additional aspects of CDE's contentions that EPA's decisions were undermined by procedural flaws are considered immediately below.

### 4. Commitment and Agency Performance

▪ CDE's procedural challenges are based principally on the contention that additional comment periods should have been or

should now be required. This contention is without merit.

The allegedly new matters constitute an extremely small percentage of all the evidence, scientific opinion, and other factors that a court might now find to be relevant, with evidence before it beyond all that was available to the EPA. Well over 90 percent of all the opinions and data marshaled in the testimony of the experts at this trial were restatements or rhetorically refurbished presentations of data and opinions expressed in proceedings before the EPA. All these matters were the subject of reasoned resolutions among conflicting inferences that might reasonably be drawn from the administrative record.

The allegedly "new" scientific information is itself presented by CDE's principal expert witness as unfinished work. Neither an agency nor a court is acting arbitrarily and capriciously when deciding it is not appropriate to delay decisions because of a scientist's unfinished work, even if that work may lead the scientist to be cautious about saying what should be done now to remedy a problem that is causing ongoing harm in the community.

Also, an agency is not required to perpetuate proceedings indefinitely for new rounds of comment.

Even on the assumption that a critic has identified flaws in the EPA's reasoning, errors of marginal materiality are not to be treated as grounds for new rounds of comment or grounds for setting aside or delaying implementation of a remedial order that is well supported by the administrative record and the court record. This conclusion is supported by the terms of another section of the statute:

In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made.

42 U.S.C. § 9613(j)(4).

With respect to new rounds of comment in the context of actions by another governmental agency (not the EPA), the opinion in *O'Connell v. Shalala,* 79 F.3d 170 (1st Cir. 1996), responded to a contention that the Secretary of Health and Human Services must recommit a proposed interpretation of a regulation regarding comments received from the Advisory Commission on Childhood Vaccines (ACCV), established under statutory mandate in the National Childhood Vaccine Injury Act. That opinion observes:

If the Secretary is forced to recommit a proposed regulation and twiddle her thumbs for an additional three months every time she responds agreeably to an ACCV suggestion, she may be less inclined to acquiesce in the first place. Hence, the interpretation that we adopt actually may increase the chance that the Secretary will pay attention to, and act upon, the ACCV's advice.

79 F.3d at 180. This observation about perverse incentives is applicable to the present case. It supports the determination, which this court makes, that the alleged procedural flaws regarding notice and comment on which CDE relies are not materially "related to matters of such central relevance to the [EPA's] action that the action would have been significantly changed had such errors not been made," 42 U.S.C. § 9613(j)(4).

## ORDER

For the foregoing reasons, it is ORDERED:

The Clerk is directed to enter forthwith on a separate document a Final Judgment as follows:

1. Judgment, with costs, for defendants Federal Pacific Electric Company, Mohasco Corporation, Monogram Industries, Inc., d/b/a American Flexible Conduit, New England Telephone & Telegraph Company, Nortek Inc., and Ottaway Newspapers, Inc. All claims of these defendants and defendant Cornell–Dubilier Electronics, Inc. (including counterclaims and crossclaims) among themselves and against all plaintiffs are dismissed as waived or moot.

2. With respect to reasonable costs of remediation incurred by plaintiffs from the

beginning through December 20, 1996, as to Operable Unit No. 1, the court declares judgment for plaintiffs against defendant Cornell–Dubilier Electronics, Inc. (CDE), in the amount of $656,452.42 (being seven (7.0) percent of $8,020,748.95 of remediation costs already paid by plaintiffs, as stipulated, plus $95,000.00 in prejudgment interest as stipulated by the parties), plus costs. This part of the judgment bears postjudgment interest from the date the clerk enters this judgment on the docket of the court at the rate of 5.56% percent per annum.

3. With respect to reasonable costs of remediation incurred by plaintiffs after December 20, 1996, as to Operable Unit No. 1, the court declares judgment for plaintiffs against CDE, in that CDE is legally responsible for seven (7.0) percent of these costs unless this determination of its percentage share of responsibility is modified by later order of this or a higher court. This part of the judgment bears interest, on each sum of costs paid by plaintiffs, from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned, as provided in 42 U.S.C., Section 9607(a).

4. With respect to reasonable costs of remediation incurred by plaintiffs from the beginning through February 26, 1997, as to Operable Unit No. 2, the court declares judgment for plaintiffs against defendant Cornell–Dubilier Electronics, Inc. (CDE), in the amount of $229,993.95 (being fifteen (15.0) percent of $1,433,293.07 of remediation costs already paid by plaintiffs, as stipulated, plus $15,000.00 in prejudgment interest, as stipulated by the parties), plus costs. This part of the judgment bears postjudgment interest from the date the clerk enters this judgment on the docket of the court at the rate of 5.56% percent per annum.

5. With respect to reasonable costs of remediation incurred by plaintiffs after February 26, 1997, as to Operable Unit No. 2, the court declares judgment for the plaintiffs against CDE, in that CDE is legally responsible for fifteen (15.0) percent of these costs unless this determina-

tion of its percentage share of responsibility is modified by later order of this or a higher court. This part of the judgment bears interest, on each sum of costs paid by plaintiffs, from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned, as provided in 42 U.S.C., Section 9607(a).

6. All other claims (including counterclaims, crossclaims, and third-party claims) at any time asserted in this action are dismissed in accordance with the stipulations, settlements, consent decrees, and orders recited above.

### Final Judgment

The rulings, interlocutory orders, and findings material to final judgment in this case are recited here in sequence:

On June 13, 1995, this court approved a settlement and consent decree resolving all claims and counterclaims between plaintiffs and the City of New Bedford.

On February 12, 1996, upon joint motion of the parties who are plaintiffs in this action and Savit Corp., the court dismissed the plaintiffs' claims against Savit Corp. with prejudice and without costs.

On July 24, 1996, this court granted summary judgment in favor of defendant New England Telephone and Telegraph Company (NETT) against all plaintiffs, and accepted NETT's waiver of all its counterclaims and crossclaims, subject to right of withdrawal of the waiver should the judgment in its favor against all plaintiffs be vacated or modified by later order of this or a higher court.

On November 7, 1996, this court granted judgment as a matter of law, after plaintiffs had been fully heard during trial before a jury, in favor of defendant Federal Pacific Electric Company (FPE), against all plaintiffs.

On December 2, 1996, this court approved a settlement and consent decree among the Environmental Protection Agency, the parties who are plaintiffs in this case, Coaters, Inc., defendant in this case, Fibre Leather Mfg. Co., defendant in this case, and others.

Under the terms of this settlement and consent decree, all claims (including counterclaims and crossclaims) among Coaters, Inc., Fibre Leather Mfg. Co., and all plaintiffs in this case were resolved and ordered dismissed with prejudice and without costs.

On December 2, 1996, on conclusions and for reasons stated and explained orally of record at that time and supplemented in the opinion of December 17, 1996 (Docket No. 576), this court granted judgment as a matter of law, after plaintiffs had been fully heard during trial before a jury, in favor of defendants Mohasco Corporation, Monogram Industries, Inc., d/b/a American Flexible Conduit, Ottaway Newspapers, Inc., and Nortek, Inc.

On December 20, 1996, the court received the following jury verdict in response to interrogatories:

### Verdict

### I. Findings as to Costs
### Plaintiffs Have Already Incurred

1. What amount do you find by a preponderance of the evidence to be reasonable costs actually paid out by plaintiffs on or before the date of your verdict for each of the following kinds of remediation costs? Answer in DOLLARS or by a checkmark beside NONE for each of items a-k.

| | | | |
|---|---|---|---|
| a. | Payments to Baker Environmental | $ 915,314.99 | NONE ____ |
| b. | Payments to O'Brien & Gere for Implementation of Pre–Design Work Plan | $3,503,007.10 | NONE ____ |
| c. | Payments to O'Brien & Gere for Remedial Design Work | $1,284,621.15 | NONE ____ |
| d. | Payments to O'Brien & Gere for Interim Project Coordinator Work | $ 337,223.29 | NONE ____ |
| e. | Payments to Palmer & Dodge | $ 603,937.00 | NONE ____ |
| f. | Payments for Project Management Committee Work | $ 294,076.58 | NONE ____ |
| g. | Reimbursement of Past Costs to EPA and DEP | $ 644,983.30 | NONE ____ |
| h. | Payments to EPA and DEP for Oversight Costs | $ 569,850.48 | NONE ____ |
| i. | Payments to Burke and Smith for Access to Golf Course | $ 4,107.50 | NONE ____ |
| j. | Payments to New Bedford Realty for Rental of Cinema Parking Lot | $ 13,500.00 | NONE ____ |
| k. | Payments to Pettiti & Gamache, Hodgson & Pettiti, and J.G. Hodgson for Audit and Tax Work | $ 30,127.36 | NONE ____ |

### II. Findings as to Hazardous Substances

1. **PCBs**

Do you find by a preponderance of the evidence that Cornell–Dubilier Electronics (CDE) arranged for the disposal of polychlorinated biphenyls (PCBs) within the OU No. 1 area of the Sullivan's Ledge site?

X YES ____NO

2. **TCE**

Do you find by a preponderance of the evidence that Cornell–Dubilier Electronics (CDE) arranged for the disposal of trichlorethylene (TCE) within the OU No. 1 area of the Sullivan's Ledge site?

X YES ____NO

**If you answer NO to both of Questions 1 and 2, answer no other questions. Otherwise, go to Question 3 below.**

3.a. Did the quantity, toxicity, or durability (or a combination of quantity, toxicity, and durability)

> of the total PCBs and TCE, contributed by CDE and others who contributed no more than did CDE to disposal of PCBs and TCE within the OU No. 1 area,

> add enough to contamination from sources other than these to make a reasonably determinable difference in the amount of reasonably necessary response costs incurred by plaintiffs? Answer by placing a checkmark in only one of the three blanks.

>> __X__ We unanimously find YES by a preponderance
>> of the evidence
>> _____ We unanimously find NO by a preponderance
>> of the evidence
>> _____ We unanimously find no preponderance
>> of the evidence for an answer of YES or NO

3.b. Was the quantity, toxicity, or durability (or a combination of quantity, toxicity, and durability)

> of the PCBs and TCE disposed of by CDE within the OU No. 1 area

> enough to weigh as one of the "equitable factors" in your determination of fair and equitable allocation of shares of responsibility

> for reasonably necessary remediation costs already paid and to be incurred in the future by plaintiffs under their agreement and consent decree with EPA? Answer by placing a checkmark in only one of the three blanks.

>> __X__ We unanimously find YES by a preponderance
>> of the evidence
>> _____ We unanimously find NO by a preponderance
>> of the evidence
>> _____ We unanimously find no preponderance
>> of the evidence for an answer of YES or NO

**Skip Part III if you have answered NO to all of the questions you answered in Part II.**

### III. Findings as to Allocation of Shares

The percentages of responsibility you find in answering this question must add up to 100%. Under the evidence in this case, you may find that one of the equitable shares of responsibility is less than 1%. The mathematical expression of a share less than one percent may become difficult to write, read, and compare with other shares. For this reason, you are directed to express your findings in whole numbers of shares, using either the number 1 or the number 10 for the smallest share and appropriately larger numbers for all other shares.

After weighing each of the equitable factors as to which you find that evidence before you gives you a basis for assigning some weight one way or the other, and taking into account your answers to questions in Part II as to any hazardous substances at Sullivan's Ledge traceable to CDE, in order to have equitable sharing of reasonably necessary remediation costs plaintiffs have already paid and will incur in the future, what number of shares do you find to be appropriate for CDE, for plaintiffs (as a group), and for others?

### 1. Remediation Costs Plaintiffs Have Already Paid

Answer by placing a checkmark beside only one of a, b, and c. Then complete other blanks that go with whichever of a, b, or c you have checked.

_____ a. We unanimously find by a preponderance of the evidence the following shares:

 _____ shares for CDE
 _____ shares in total for plaintiffs as a group
 _____ shares for Coaters
 _____ shares for Fibre Leather

 _____ TOTAL SHARES

__X__ b. We unanimously find no preponderance of the evidence; our best estimate is that the shares should be as follows:

 _____7_____ shares for CDE
 _____83____ shares in total for plaintiffs as a group
 _____5_____ shares for Coaters
 _____5_____ shares for Fibre Leather

 _____100_____ TOTAL SHARES

_____ c. We unanimously find the evidence insufficient to make any estimate that is reasoned from evidence

## 2. Remediation Costs Plaintiffs Will Incur in the Future

Answer by placing a checkmark beside only one of a, b, and c. Then complete other blanks that go with whichever of a, b, or c you have checked.

_____ a. We unanimously find by a preponderance of the evidence the following shares:

 _____ shares for CDE
 _____ shares in total for plaintiffs as a group

 _____ shares for Coaters
 _____ shares for Fibre Leather

 _____ TOTAL SHARES

__X__ b. We unanimously find no preponderance of the evidence; our best estimate is that the shares should be as follows:

 _____7_____ shares for CDE
 _____83____ shares in total for plaintiffs as a group
 _____5_____ shares for Coaters
 _____5_____ shares for Fibre Leather

 _____100_____ TOTAL SHARES

_____ c. We unanimously find the evidence insufficient to make any estimate that is reasoned from evidence

_____12/20/96_____ _/s/ Barbara E. Rattigan_
Date Foreperson

On March 20, 1997, upon joint motion of the plaintiffs in this action and Dartmouth Finishing Corp., this court dismissed the plaintiffs' claims against Dartmouth Finishing Corp. with prejudice and without costs.

On July 23, 1997, the court denied plaintiffs' motion for a partial separate final judgment with respect to claims against Revere Copper & Brass, Inc. and Revere Copper Products, Inc. (together called "Revere"), and allowed plaintiffs' alternative motion for dismissal without prejudice of their claims against Revere, subject to an application for leave to seek reinstatement of such claims should a higher court reverse, vacate, or otherwise set aside the final judgment dismissing plaintiffs' claims against one or more of the other defendants.

On July 14–18 and 21–23, 1997, on findings and conclusions and for reasons stated orally of record at hearings commencing on January 2, 1997 and concluding on July 23, 1997, and supplemented in the opinion of July 30, 1997, this court made additional rulings and orders resolving other issues material to final judgment.

For the reasons and on the findings, rulings and orders recited above, the court orders final judgment as follows:

1. Judgment, with costs, for defendants Federal Pacific Electric Company, Mohasco Corporation, Monogram Industries, Inc., d/b/a American Flexible Conduit, New England Telephone & Telegraph Company, Nortek Inc., and Ottaway Newspapers, Inc. All claims of these defendants and defendant Cornell–Dubilier Electronics, Inc. (including counterclaims and crossclaims) among themselves and against all plaintiffs are dismissed as waived or moot.

2. With respect to reasonable costs of remediation incurred by plaintiffs from the beginning through December 20, 1996, as to Operable Unit No. 1, the court declares judgment for plaintiffs against defendant Cornell–Dubilier Electronics, Inc. (CDE), in the amount of $656,452.42 (being seven (7.0) percent of $8,020,748.95 of remediation costs already paid by plaintiffs, as stipulated, plus $95,000.00 in prejudgment interest as stipulated by the parties), plus costs. This part of the judgment bears postjudgment interest from the date the clerk enters this judgment on the docket of the court at the rate of 5.56% percent per annum.

3. With respect to reasonable costs of remediation incurred by plaintiffs after December 20, 1996, as to Operable Unit No. 1, the court declares judgment for plaintiffs against CDE, in that CDE is legally responsible for seven (7.0) percent of these costs unless this determination of its percentage share of responsibility is modified by later order of this or a higher court. This part of the judgment bears interest, on each sum of costs paid by plaintiffs, from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned, as provided in 42 U.S.C. Section 9607(a).

4. With respect to reasonable costs of remediation incurred by plaintiffs from the beginning through February 26, 1997, as to Operable Unit No. 2, the court declares judgment for plaintiffs against defendant Cornell–Dubilier Electronics, Inc. (CDE), in the amount of $229,993.95 (being fifteen (15.0) percent of $1,433,293.07 of remediation costs already paid by plaintiffs, as stipulated, plus $15,000.00 in prejudgment interest, as stipulated by the parties), plus costs. This part of the judgment bears postjudgment interest from the date the clerk enters this judgment on the docket of the court at the rate of 5.56% percent per annum.

5. With respect to reasonable costs of remediation incurred by plaintiffs after February 26, 1997, as to Operable Unit No. 2, the court declares judgment for the plaintiffs against CDE, in that CDE is legally responsible for fifteen (15.0) percent of these costs

unless this determination of its percentage share of responsibility is modified by later order of this or a higher court. This part of the judgment bears interest, on each sum of costs paid by plaintiffs, from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned, as provided in 42 U.S.C. Section 9607(a).

6. All other claims (including counter-claims, crossclaims, and third-party claims) at any time asserted in this action are dismissed in accordance with the stipulations, settlements, consent decrees, and orders recited above.